STATE OF NORTH CAROLINA v. TYDIS JOHNSON

No. COA98-359

(Filed 7 March 2000)

**1. Confessions and Incriminating Statements— initiation of conversation—nodding of head**

In a first-degree murder and robbery with a dangerous weapon case where defendant-juvenile stated he did not wish to answer any questions, his mother interjected that "we need to get this straightened out today and we'll talk with him anyway," defendant thereafter nodded affirmatively to the detective after considering his mother's statement, and then the detective asked if defendant wanted to answer questions without a lawyer or parent being present, the trial court did not err by denying defendant's motion to suppress his statement to the Shelby Police where he confessed to shooting the victim because defendant initiated the conversation in which he made the incriminating statement by nodding his head to the officer. N.C.G.S. § 7A-595.

**2. Discovery— statements of defendant—juvenile rights form—synopsis of oral statements**

The trial court did not err in a first-degree murder and robbery with a dangerous weapon case by denying defendant's objection to a detective's testimony elicited from the juvenile rights form, on the basis that it was a statement of defendant and had not been provided to defendant by the district attorney in response to defendant's request prior to trial, because: (1) the State provided defendant with copies of the completed juvenile rights and waiver of rights form, and the bottom of the form provides handwritten notation of the answers given by defendant in response to questions as to waiving his juvenile and Miranda rights; and (2) the State provided defendant with copies of the four-page written statement of defendant, which complies with the "substance" requirement of N.C.G.S. § 15A-903(a).

**3. Evidence— lay opinion—personal perception**

The trial court did not err in a first-degree murder and robbery with a dangerous weapon case by refusing to sustain defendant's objection to the State's questioning of the detectives as to their opinions of defendant's understanding of the juvenile rights form because the opinions were based on the detectives' personal

perceptions of defendant at the time of the confession and helped the trial court determine the issue of the voluntariness of defendant's statement. N.C.G.S. § 8C-1, Rule 701.

**4. Evidence— expert—exclusion of testimony—no prejudicial error**

The trial court did not commit prejudicial error in a first-degree murder and robbery with a dangerous weapon case by refusing to allow the testimony of a certified school psychologist and a child psychologist, concerning whether someone with attention deficit disorder would be able to sit in a room at a table for over an hour with full attention and at what reading level a certain statement was written, because: (1) defendant did not place in the record the testimony which was propounded; and (2) defendant has failed to show that a different result would probably have occurred at trial if the answers to the two questions had been permitted.

**5. Accomplices and Accessories— jury instruction—accessory after the fact—tried as a principal**

The trial court did not err in a first-degree murder and robbery with a dangerous weapon case by refusing to instruct the jury on the charge of accessory after the fact because a defendant tried as a principal may not be convicted of the crime of accessory after the fact since it is a substantive crime and not a lesser degree of the principal crime.

Appeal by defendant from judgments entered 21 May 1997 by Judge Chase B. Saunders in Cleveland County Superior Court. Heard in the Court of Appeals 26 January 1999.

*Attorney General Michael F. Easley, by Special Deputy Attorney General Francis W. Crawley, for the State.*

*Bridges & Gilbert, P.A., by R. L. Gilbert, III and William C. Young, for defendant-appellant.*

HUNTER, Judge.

Tydis Johnson ("defendant") appeals his conviction for the offenses of first degree murder and robbery with a dangerous weapon of Danny Ray Pack ("Pack") which occurred on 23 August 1996 in Shelby, North Carolina. We affirm.

The State presented evidence at trial which showed that Michael Page ("Page") was working as the dispatcher for United Cab in Shelby, North Carolina during the early morning hours of Friday, 23 August 1996. At 4:31 a.m., Page received a telephone call in which a male voice asked for a taxi cab to come to Apartment D, the Meadows Apartments, 1501 Eaves Road in Shelby. Taxi driver Pack was dispatched to this address at 4:36 a.m. and eight to ten minutes later called on his car radio and asked the dispatcher to call the requesting party as he was waiting outside. Page's return telephone call was answered by a woman who said she lived at Apartment J-5, Holly Oak Apartments. While Page was speaking to the woman, Pack called by radio and said "[g]ive me a ten thirteen out here. I think I've been shot." Page asked the woman to hang up and then called 911, informing the operator that a cabdriver had been shot at 1501 Eaves Road, Apartment D. Pack radioed again, and in a gurgling voice said that he had been shot. In less than a minute, Pack called in a third time.

Responding to the 911 call, Shelby police officer T. L. Green arrived at the parking lot of the 1501 building at the Meadows Apartments at 4:46 a.m. Officer Green observed that Pack, who was still breathing, was lying partially in the taxi with his head on the carpeted area by the driver's seat. A large pool of blood was underneath Pack. When the emergency medical personnel moved Pack to the emergency vehicle, Officer Green observed an empty holster on Pack's left side. It was subsequently discovered that he had been carrying a Lorcin nine-millimeter pistol that night.

Pack subsequently died. At trial, Dr. Steve Tracy testified that Pack had incurred two gunshot wounds to the head on the morning of 23 August 1996. His cause of death was the wound that caused a depressed skull fracture and bruising of the brain.

Shelby Police Detective Jim Glover talked to suspects Eric Wright ("Wright") and Keith Hamilton ("Hamilton") within two days following the murder of Pack. Both indicated that defendant was involved in the robbery and murder of Pack. On 26 August 1996, Shelby Police Officer Wacaster saw defendant sitting in the front passenger seat of a car that was stopped at a gasoline pump at Super Dave's Convenience Store, located several blocks from the Meadows Apartments. After obtaining the driver's consent, Officer Wacaster searched the glove box and seized a silver .32 caliber pistol and eight cartridges wrapped inside a plastic bag. Detective Glover approached

defendant in the presence of other police officers at Super Dave's and informed defendant that the police were investigating a shooting incident and asked defendant to go the police department. Defendant stated that he did not wish to do so, and Detective Glover placed defendant under arrest for the homicide of Pack. Defendant was 15 years of age at the time of his arrest.

Defendant was then driven to the police department, where, in his mother's presence, defendant was advised of his Miranda rights, which defendant said he understood. Defendant then said that he did not want to answer questions. At that point, defendant's mother interjected and told the defendant that "we need to get this straightened out today and we'll talk with him anyway." Defendant then nodded affirmatively to Detective Glover, who then asked if defendant wanted to answer questions without a lawyer or parent being present. Defendant answered "yes" and signed a waiver of rights form, which was also signed by defendant's mother, Detective Glover and Detective Jeff Ledford.

Defendant was then questioned about the incident. Defendant first indicated that he did not know anything about the murder of Pack; however, defendant became emotional after being told that other persons had been interviewed, and the reasons why he was being interviewed. Defendant indicated that he wanted to talk without his mother being present, and she and Detective Ledford then left the room. Defendant then said he was involved and wanted to talk about the incident. Approximately five minutes later, defendant's mother returned, and defendant told her what he had just said to Detective Glover. In his mother's presence, defendant made a statement to Detective Glover describing the circumstances surrounding the shooting of Pack on 23 August 1996.

Defendant's statement indicated that on the evening of 22 August 1996, defendant had been in the company of Wright and Hamilton at defendant's brother's apartment at Holly Oak Apartments, number J-1. Wright called the taxi from Nancy Dawkins' apartment, number J-5 at Holly Oak Apartments, and then the boys walked to the Meadows Apartments. As they saw the cab approaching the Meadows Apartments, the boys ran towards it and Hamilton pointed a .22 rifle at the cab driver, who tried to pull the rifle away. When the cab driver reached for his own pistol, defendant shot him in the jaw on the right side of the head. Defendant reached in the passenger side door and tried to take the radio scanner which would not come loose. Hamilton picked up Pack's fallen pistol and defendant dropped his gun and

began to run. Defendant left Wright at the car and heard another shot as he turned to run. Several minutes later at defendant's brother's apartment in Holly Oak Apartments, Wright came in holding a bloody towel, and said, "I blasted that fool." Defendant said that Wright later sold Pack's nine-millimeter pistol for one hundred dollars.

The State's evidence regarding weapons showed that police officers subsequently executed a search warrant and seized a .22 rifle from under a couch in apartment J-1 of the Holly Oak Apartments and also two .38 caliber bullets and an amplifier. Melvin Jamerson purchased a nine-millimeter pistol from defendant after 23 August 1996 for one hundred dollars. The transaction occurred in the Holly Oak Apartments and Jamerson asked defendant if the gun was hot or had any bodies on it. Defendant answered "no." The silver .32 caliber pistol and cartridges obtained from the vehicle in which defendant was a passenger on 26 August 1996 and two fired bullets from the murder scene were submitted to the North Carolina State Bureau of Investigation ("SBI") for comparison. SBI Special Agent Ronald Marrs compared the fired bullets found at the murder scene and those taken from Pack's scalp and determined that both were fired from the .32 caliber pistol to the exclusion of all other firearms.

Defendant, Hamilton, and Wright all had conflicting accounts of the shooting. Hamilton stated that he inflicted Pack's first wound. Wright admitted calling the cab company and walking with Hamilton and defendant to meet the cab, but denied seeing who actually shot Pack. Hamilton pleaded guilty to second degree murder for the killing of Pack. Wright pleaded guilty to robbery with a dangerous weapon and accessory to the murder of Pack. Defendant was tried and found guilty of first degree murder and robbery with a dangerous weapon, and was sentenced to a term of life imprisonment without parole.

[1] First, defendant contends that the trial court erred in its denial of his motion to suppress his statement to the Shelby Police in which he confessed to shooting Pack. Defendant argues his statement should have been suppressed because the evidence shows that after his interrogation had begun, defendant indicated to the police that he did not wish to answer any questions and at this point, questioning should have ceased.

N.C. Gen. Stat. § 7A-595 regarding interrogation procedures for juveniles, provides in pertinent part:

(a) Any juvenile in custody must be advised prior to questioning:

(1) That he has a right to remain silent; and

(2) That any statement he does make can be and may be used against him; and

(3) That he has a right to have a parent, guardian or custodian present during questioning; and

(4) That he has a right to consult with an attorney and that one will be appointed for him if he is not represented and wants representation.

. . .

(c) If the juvenile indicates in any manner and at any stage of questioning pursuant to this section that he does not wish to be questioned further, the officer shall cease questioning.

N.C. Gen. Stat. § 7A-595 (1989).

As is required, the trial court in the present case issued an order stating how it resolved the conflicts in evidence presented by the State and defendant as to whether the defendant wished to be interrogated. See State v. Lang, 309 N.C. 512, 308 S.E.2d 317 (1983); State v. Braxton, 343 N.C. 120, 468 S.E.2d 59, opinion after remand, 344 N.C. 702, 477 S.E.2d 172 (1996). The trial court made the following findings of fact, in pertinent part:

5. The interrogation of the defendant took place in the law library. . . . Present during most of the interrogation were the defendant, his mother, Detective Glover and [Detective] Ledford who was there to serve as a witness;

. . .

7. After the [Miranda] rights were read, Glover asked the defendant the questions that appear in the waiver section of the rights form. He first asked the defendant, "Do you understand each of these rights I have explained to you?"[] The defendant initially responded by nodding his head affirmatively as he had done previously. Detective Glover instructed the defendant that he had to respond verbally by answering either "yes" or "no". The defendant said "yeah". Detective Glover then asked the defendant the next question—"Having these rights in mind, do you wish to

answer questions?" The defendant answered "No". Immediately after the defendant gave that response, his mother turned to him and said "No, we need to get this straightened out today. We'll talk with him anyway." The defendant looked at his mother. He lowered his head and appeared to be considering what his mother had said. He then turned to Detective Glover and nodded his head affirmatively. Detective Glover then asked the defendant the third question, "Do you now wish to answer questions without a lawyer present?"[] The defendant responded, "Yes." Detective Glover next asked him the fourth and last question, "Do you wish to answer the questions without a parent, guardian or custodian present?" The Defendant answered, "Yes." At that point, Detective Glover handed the waiver form to the defendant's mother who read the form then signed it. The form was then passed to the defendant who simply signed the form without reading it;

8. After the defendant had been advised of his rights, Glover proceeded to interrogate the defendant. Initially Glover engaged the defendant in casual conversation that was unrelated to the events that led to the defendant's arrest. Detective Glover then asked the defendant if he wanted to talk about the robbery and murder of Danny Pack. The defendant indicated a willingness to talk to Glover about the murder. Glover handed the defendant a pen and paper and asked him to write down what had occurred. The defendant made a few marks on the paper, appeared to become frustrated, pushed the paper across the table to Glover and asked Glover to record his statement. . . .

While defendant initially stated that he did not want to answer any questions, within a few moments, he rescinded this decision by nodding his head affirmatively to Detective Glover. When asked, defendant stated that he would answer questions without an attorney present.

This Court has stated: "[W]hen a person in custody indicates he does not wish to make a statement, the officers may not take an inculpatory statement from him unless the defendant initiates the conversation in which he waives his rights." *State v. Bragg*, 67 N.C. App. 759, 760, 314 S.E.2d 1, 1 (1984). When a defendant indicates he does not wish to answer questions but later responds to further questioning, "the crucial issue is who initiated the conversation in which the defendant made the incriminating statement." *State v. Crawford*, 83 N.C. App. 135, 137, 349 S.E.2d 301, 302 (1986), *cert. denied*, 319 N.C.

106, 353 S.E.2d 115 (1987); *see also Oregon v. Bradshaw*, 462 U.S. 1039, 1043, 77 L. Ed. 2d 405, 411 (1983) (an accused in custody is not subject to further interrogation after requesting counsel until counsel has been made available to him unless the accused himself initiates further *communication, exchanges, or conversations* with the authorities).

In the present case, defendant stated that he did not wish to answer any questions, but then, upon considering his mother's statement, he turned to the police officer and nodded his head affirmatively. In response to defendant's nod indicating "yes," Detective Glover asked defendant if he then wished to answer questions without a lawyer present and defendant answered "yes." By turning to the detective and nodding his head affirmatively to him, defendant communicated with him and thus initiated further conversation. If defendant had not made this gesture to the detective, the detective could not have continued questioning him. Because defendant initiated communication, we hold that defendant's subsequent statement was admissible. Accordingly, this assignment of error is overruled.

**[2]** Defendant next contends that the trial court committed reversible error by denying defendant's objection to testimony of Detective Glover elicited from the juvenile rights form on the basis that it was a statement of the defendant and had not been provided to defendant by the district attorney in response to defendant's request prior to trial. N.C. Gen. Stat. § 15A-903(a) provides, in pertinent part:

> (a) Statement of Defendant.—Upon motion of a defendant, the Court must order the prosecutor:
>
> . . .
>
> (2) To divulge, in written or recorded form, the substance of any oral statement relevant to the subject matter of the case made by the defendant, regardless of to whom the statement was made, within the possession, custody or control of the State, the existence of which is known to the prosecutor or becomes known to him prior to or during the course of trial . . . .

N.C. Gen. Stat. § 15A-903(a)(2) (1999). The State contends that it properly "responded to defendant's request for voluntary discovery by providing copies of the completed [j]uvenile rights and waiver of rights form and the four-page written statement of defendant," to

defendant during discovery and that the substance of defendant's statements were shown on this form.

The completed juvenile rights and waiver of rights form, which was provided to defendant, provides, in pertinent part:

[I]t [is] clear to me that I have the following rights:

(1) You have the right to remain silent.

(2) Anything you say can be and may be used against you.

(3) You have the right to have a parent, guardian or custodian present during questioning.

(4) You have the right to talk with a lawyer for advice before questioning and to have that lawyer with you during questioning. If you do not have a lawyer and want one, a lawyer will be appointed for you.

(5) If you consent to answer questions now, without a lawyer, parent or guardian present, you still have the right to stop answering at any time.

### WAIVER

(1) Do you understand each of these rights I have explained to you?

Answer "yeah" (handwritten)

(2) Having these rights in mind do you now wish to answer questions?

Answer "no" (handwritten)

(3) Do you now wish to answer questions without a lawyer present?

Answer "yes" (handwritten)

(4) Do you now wish to answer questions without a parent, guardian or a custodian present?

Answer "yes" (handwritten)

The form was signed by defendant, his mother, Detective Ledford and Detective Glover.

The trial transcript reveals that during trial, Detective Glover testified as to answers the defendant gave in response to questions

about locating his mother and his Miranda and juvenile rights under N.C. Gen. Stat. § 7A-595, which are combined together and listed (1)-(5) on the form. A "check" mark is handwritten beside each number from (1) to (5). Detective Glover testified that the check by each number was written by him after he read the corresponding right to defendant and after each was read, defendant either indicated non-orally that he understood the right or did nothing to indicate that he did not understand. He testified that after he read right number one, "[defendant] indicated that it was all right, and I made a check on the one or the number beside it, that he indicated that he understood that right." Detective Glover testified that defendant made no statement in response to any of the Miranda rights read to him, and indicated that defendant did not make a non-oral assertion for any right except the first one. Thus, Detective Glover did not testify as to any oral statement defendant made in response to the reading of defendant's rights. Our review indicates that the bottom of the form clearly provides handwritten notation of the answers given by the defendant in response to questions as to waiving his juvenile and Miranda rights.

The sanctions for failure to comply with statutory discovery requirements are permissive and a trial court's decision may be disturbed only upon a showing of abuse of discretion. *State v. Bearthes*, 329 N.C 149, 405 S.E.2d 170 (1991). The ruling on defendant's motion will not be disturbed on appeal "absent a showing of bad faith by the state in its noncompliance with the discovery requirements." *State v. McClintick*, 315 N.C. 649, 662, 340 S.E.2d 41, 49 (1986). Additionally, defendant must demonstrate he was prejudiced by the State's non-compliance and that, if the substance of the oral statements had been provided earlier, the outcome of the trial would have differed. *Id.* Our Supreme Court has held that delivery of a synopsis of a defendant's oral statements in response to discovery requests complies with the "substance" requirement of N.C. Gen. Stat. § 15A-903(a)(2). *State v. Weeks*, 322 N.C. 152, 367 S.E.2d 895 (1988). Because Detective Glover did not testify that defendant made a statement in response to the reading of his rights at the top of the juvenile rights and waiver of rights form, the State could not have provided a recorded statement by the defendant in response to the reading of these rights. Thus, the State did not fail to comply with discovery under N.C. Gen. Stat. § 15A-903(a)(2). Likewise, defendant has failed to show an abuse of discretion through bad faith by the State during discovery. Accordingly, this assignment of error is overruled.

**[3]** Next, defendant contends that the trial court erred in refusing to sustain defendant's objection to the State's questioning of Detective Glover and Detective Ledford as to their opinion of the defendant's understanding of the juvenile rights form. Defendant argues that the question asked for more than the officers' perception of him and that the officers did not have sufficient expertise to form an opinion.

First, we note that juvenile is defined as a "person who has not reached his eighteenth birthday and is not married, emancipated, or a member of the armed services of the United States." N.C. Gen. Stat. § 7A-517(20) (1989). It is uncontroverted that defendant was a juvenile at the time of his interrogation. The trial court must find that the juvenile knowingly, willingly, and understandingly waived his rights before admitting into evidence any statement resulting from custodial interrogation. N.C. Gen. Stat. § 7A-595(d) (1989). The determination of whether a waiver is knowingly and intelligently made is dependent on the specific facts and circumstances of each case, including background, experience, and conduct of the accused. *State v. Miller*, 344 N.C. 658, 477 S.E.2d 915 (1996). The burden rests on the State to show the juvenile defendant made a knowing and intelligent waiver of his rights. *Id.*

Opinion testimony by a lay witness is allowed if "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue." N.C.R. Evid. 701. The State contends that the detectives' opinions that defendant understood his Miranda rights were based upon their personal perception of defendant and was helpful to the trial court in determining the ultimate fact at issue—whether defendant understandingly, knowingly, and willingly waived his rights.

In *State v. Jones*, 342 N.C. 523, 467 S.E.2d 12 (1996), a police officer's opinion of the defendant's mental capacities at the time of the confession was properly admitted because his opinion

> was rationally based on his perception of defendant at the time of the confession. Furthermore, it was necessary that he give his opinion as to defendant's mental state at the time of the confession to help determine a crucial fact in issue, that is, that defendant voluntarily gave the statement to police.

*Id.* at 538, 467 S.E.2d at 21.

In the case at bar, Detective Glover read the juvenile rights and waiver form to defendant and noted defendant's responses on the

form. Detective Glover expressed his opinion at trial that defendant understood his rights and the waiver of those rights. Detective Ledford was present while the juvenile rights and waiver of rights were read to defendant and testified that his opinion was that defendant understood his rights and the waiver. If a police officer's opinion is not based upon his own perception, then it would not qualify as lay opinion under N.C. Gen. Stat. § 8C-1, Rule 701. However, as was the case in *Jones*, the opinions of Detective Glover and Detective Ledford were based upon their personal perception of defendant at the time of the confession and helped the trial court determine the issue of the voluntariness of the defendant's statement. *See also State v. Westall*, 116 N.C. App. 534, 449 S.E.2d 24, *disc. review denied*, 338 N.C. 671, 453 S.E.2d 185 (1994). Accordingly, their testimony on this issue was properly admitted.

[4] Defendant's next assignment of error concerns the trial court's disallowance of testimony by Jo Bralley, a certified school psychologist, and Dr. Ben J. Williams, a child psychologist.

During trial, defendant asked Bralley her opinion as to whether "someone with [attention deficit disorder] would you expect them to be able to sit in a room at a table for well over an hour and maintain full attention?" Defendant contends "this is a question within the purview of Ms. Bralley's experience and expertise and she should have been allowed to answer." However, once the State objected, defendant did not place in the record the testimony which was propounded. Likewise, defendant did not place in the record testimony elicited from Dr. Williams by the question "[d]o you have an idea at what reading level that statement was written on?" A reviewing court cannot determine whether the exclusion of the evidence sought to be presented is prejudicial error without knowing what the evidence would have been. *State v. King*, 326 N.C. 662, 392 S.E.2d 609 (1990). We cannot determine what the evidence defendant propounded would have indicated. Therefore, we cannot determine if prejudicial error occurred. Defendant has failed to show that a different result would probably have occurred at trial if the school psychologist and child psychologist had been permitted to answer the above-mentioned questions, and has failed to carry his burden of showing prejudicial error under N.C. Gen. Stat. § 15A-1443(a). Accordingly, this assignment of error is overruled.

[5] Next, defendant contends that the trial court committed reversible error by refusing to instruct the jury on the charge of accessory after the fact when there was ample evidence supporting

SOUTHERN FURN. HDWE., INC. v. BRANCH BANKING & TR. CO.

[136 N.C. App. 695 (2000)]

such instruction. A defendant charged and tried as a principal may not be convicted of the crime of accessory after the fact. *State v. McIntosh*, 260 N.C. 749, 133 S.E.2d 652 (1963), *cert. denied*, 377 U.S. 939, 12 L. Ed. 2d 302 (1964). Accessory after the fact "is a substantive crime—not a lesser degree of the principal crime." *Id.* at 753, 133 S.E.2d at 655. Based on the foregoing, this assignment of error is overruled. Defendant has abandoned all other assignments of error.

No error.

Judges GREENE and JOHN concur.