STATE OF NORTH CAROLINA
v.
CALVIN NICHOLSON
No. COA08-1007
Court of Appeals of North Carolina.
Filed June 16, 2009
This case not for publication
Attorney General Roy A. Cooper, III, by Assistant Attorney General Amy C. Kunstling, for the State.
Sue Genrich Berry, for defendant.
ROBERT C. HUNTER, Judge.
Calvin Nicholson ("defendant") appeals from judgment entered 1 April 2008[1] in accordance with a jury verdict finding him guilty of second degree murder. After careful review of defendant's arguments, we find no error.

I. Background
At trial, the State presented evidence tending to show that on 5 November 2005, Todd Douglas ("Douglas") was killed in a drive-by shooting in which defendant had participated. In November 2005, both defendant and Douglas were students at Hillside High School inDurham, North Carolina, and on 3 November 2003, they had gotten into a verbal confrontation at school.
Douglas and Kevin Guy ("Guy") were acquaintances. Guy had previously had problems with "the twins," Sheldon Stuart ("Sheldon") and Shelton Stuart ("Shelton")[2], who, like defendant, lived in Hearthside, a low-income housing complex in Durham. According to Guy, both Sheldon and Shelton were members of the Bloods gang. Sheldon testified that he had some friends who were in the Bloods and that "[p]eople was [sic] saying that [Douglas] was in [the Crips] gang[,]" a rival gang to the Bloods.
According to Guy, Douglas had been involved in at least one prior incident where gunfire was exchanged with Blood members from Hearthside. In addition, Guy testified that, in the past, a group of Bloods, which included Sheldon and Shelton, tried to "jump" him, and gunfire was exchanged. Sheldon testified that, on a prior occasion, Guy had chased his brother Shelton and others through Hearthside with a gun.
Guy testified that on the night of Douglas's murder, he and Douglas were walking together, when shots were fired at them from the driver's side windows of a Toyota Camry and a Honda. Guy testified that he fired Douglas's .38 four times in response.
Sheldon testified that when the shooting occurred, he was riding in a Toyota Camry, which was behind a Honda Accord. According to him, Justin Hatch ("Hatch") drove the Camry, and Gary Becton ("Becton") and a man named Matt were the other passengers. He stated that Leon Woods ("Woods") (a/k/a "JR or "Junior") drove the Accord and that defendant, Shelton, and Ashton Byrd ("Byrd") (a/k/a "Poo") were the passengers. Sheldon testified that he saw defendant with a .22 revolver in his possession and that when the cars drove toward Douglas and Guy, he saw gunshots fired from the driver's side back seat of the Honda, which was where defendant was sitting. Sheldon further stated that, later that night, defendant came to his home and told him that he had shot at Douglas.
Douglas was found dead at the scene; the cause of death was attributed to blood loss from a single gunshot wound to his right, upper chest. A .22 caliber slug was recovered from his body.
During the subsequent investigation, Detective Alonzo Jaynes ("Jaynes") obtained information from a Hillside school resource office, which led police to believe that defendant and Becton were possibly involved in the shooting. In addition, Jaynes stated that on 6 May 2005, the day after the shooting, Sheldon told him that, around 10:00 p.m. on the night of the murder, defendant had knocked on his door and said that "he had just shot at C-Style."[3]
On 7 November 2005, Jaynes went to defendant's residence dressed in plain clothes and found him sitting outside with one or two family members. Jaynes introduced himself, told defendant he was investigating the shooting that had occurred on 5 November, and asked if he would come to the Durham Police Department to talk with him. Defendant agreed and rode in a van driven by a family member, which followed Jaynes's unmarked car. Upon arrival at the Durham Police Department, Jaynes separated defendant from his family, placed him in an interview room, and told him to wait. Jaynes then spoke to defendant's aunt, and another officer spoke with his mother and grandmother, all of whom had accompanied defendant in the van.
Following this, Jaynes spoke with defendant, who gave two statements that Jaynes wrote down at defendant's request. In the first statement, defendant told Jaynes that he, Hatch, Becton, and Byrd were riding in a Camry, driven by Hatch, and that Woods, the twins, and a man named Philip were in a car behind them, driven by Woods. Defendant stated that some of the occupants of the other vehicle fired at Douglas and Guy, and that when Hatch later "asked them why they did that[,]" the "[t]win with the hair[,]" i.e., Sheldon Stuart, said: "The mother f____ should of never shot at us."
Shortly thereafter, defendant gave a second statement. In it, defendant said that he was riding in a car with Hatch, Becton, and Byrd when "[t]win spotted" Douglas and Guy, and "[b]oth of the twins and Phil" started shooting. Defendant further stated that Hatch gave him a gun and told him to shoot it, which defendant did. However, he claimed that he only fired the gun one time into the air and in the opposite direction from where Douglas and Guy were located. Defendant's second statement was interrupted when Sergeant Jack Cates ("Cates") knocked on the interview room door, at which point, the two officers stepped outside and Jaynes briefed Cates on the matter. Based on their conversation, Cates decided to Mirandize defendant. Cates testified that he advised defendant of his Miranda rights, including his juvenile rights warning, using the Durham Police Department's "Rights Form". Cates stated that defendant indicated that he understood his rights and elected to waive them, and that defendant printed his name on the Rights Form and dated it.
Subsequent to this, defendant gave a third, detailed statement to Cates, consisting of twelve pages of text and two pages of diagrams, which Cates wrote at defendant's request. In the third statement, defendant told Cates that Hatch, the twins, Woods, and Phillip were members of the Bloods and that he believed that Douglas was in the Crips. He stated that prior to the shooting, the "twin with the hair" said, in reference to Douglas, "`I'm going to go and get this mother f____ because he shot at me.'" Defendant also stated that earlier, he had spoken with Hatch about joining the Bloods, that Hatch had told him that he would have "`to put in work'" to get in, and that Hatch handed him a .380. Defendant admitted firing the .380 at Douglas two times and stated that he did not know if one of those shots had hit him. He also stated that the occupants of the car in front of him, which included the two twins and Phillip, "fired a lot or until they ran out of bullets." Defendant told Cates that he believed that the"[t]win with hair" had a .22 caliber pistol and that defendant had shot at Douglas because he "thought [he] wanted to join the gang[.]"
Prior to trial, defendant moved to suppress the statements he made to Jaynes and Cates, arguing, inter alia, that the statements were made in violation of his state and federal constitutional rights. At the hearing regarding defendant's motion to suppress, the trial court heard testimony from: Jaynes; Cates; Joyce Nicholson, defendant's aunt; Mildred Nicholson, defendant's mother; Dr. Barbara Walter ("Dr. Walter"), a psychologist at Duke University Medical Center, who had met with defendant on 14 December 2000 to perform an evaluation related to school performance concerns; and Dr. Charles Vance ("Dr. Vance"), a forensic psychiatrist at Dorothea Dix Hospital, who had examined defendant prior to trial. Defendant did not testify, but he did provide an affidavit stating, inter alia, that: police denied his request to speak with his mother; he was questioned for over three hours without knowing his rights; he "did not write or make the [alleged] statements"; he was not given his "Juvenile Rights Warnings" until after the police wrote the alleged statements; and police told him that if he signed the written statements, he could "go home or receive a lesser charge."
On 20 March 2008, the trial court made extensive findings of fact and conclusions of law in open court. Based on these findings and conclusions, the trial court determined that "defendant's Constitutional and Statutory Rights were not violated in the obtainment of statements from him by law enforcement officers and that the statements [were] admissible. . . ."
Defendant did not testify at trial. However, both Dr. Walter and Dr. Vance testified for the defense regarding defendant's subnormal mental ability.[4]
The jury returned a verdict of guilty of second degree murder. The court sentenced defendant within the mitigated range of 120 to 153 months imprisonment. This appeal followed.

III. Analysis

A. Motion to Suppress
On appeal, defendant assigns error to several findings of fact made by the trial court in denying his motion to suppress the two statements he made to Jaynes and the statement he made to Cates. Specifically, defendant contends: (1) that there was no competent evidence to support the trial court's finding that his statements to law enforcement were not the product of threats, coercion, fear, promises, favors or rewards; and (2) that the trial court's findings regarding his intellectual functioning minimized his mental deficits, ignored testimony from Dr. Walter, and therefore, were not supported by competent evidence. In addition, defendant asserts that law enforcement's improper promises rendered all of his statements "involuntary", and that these promises, coupled with his "intelligence deficits", rendered his waiver of his Miranda rights "involuntary and unknowing." Consequently, defendant argues that the trial court's conclusions of law to the contrary constitute reversible error. In sum, defendant asserts that by denying his motion to suppress his statements, the trial court violated his state and federal constitutional rights. As discussed infra, based on the established precedent of the Supreme Court of North Carolina as well as this Court, we disagree.

i. Findings of Fact
"The standard of review in determining whether a trial court properly denied a motion to suppress is whether the trial court's findings of fact are supported by the evidence and whether its conclusions of law are, in turn, supported by those findings of fact." State v. Cortes-Serrano, ___ N.C. App. ___, ___, 673 S.E.2d 756, 762-63 (2009). "[T]he trial court's findings of fact `are conclusive on appeal if supported by competent evidence, even if the evidence is conflicting.'" State v. Buchanan, 353 N.C. 332, 336, 543 S.E.2d 823, 826 (2001) (quoting State v. Brewington, 352 N.C. 489, 498, 532 S.E.2d 496, 501 (2000), cert. denied, 531 U.S. 1165, 148 L. Ed. 2d 992 (2001)). "[T]he trial court's conclusions of law are fully reviewable on appeal." State v. McArn, 159 N.C. App. 209, 212, 582 S.E.2d 371, 374 (2003).
Here, the trial court made extensive findings of fact regarding the circumstances surrounding the three statements that defendant provided to law enforcement. At the outset, we note that defendant does not challenge the vast majority of these findings. Consequently, they are binding on appeal. "`Where no exception is taken to a finding of fact by the trial court, the finding is presumed to be supported by competent evidence and is binding on appeal.'" State v. Taylor, 178 N.C. App. 395, 401, 632 S.E.2d 218, 223 (2006) (quoting Koufman v. Koufman, 330 N.C. 93, 97, 408 S.E.2d 729, 731 (1991)).
Here, the trial court found "that at no time during the interview process by Detective Jaynes, Sergeant Cates, or any other law enforcement officer was the defendant threatened, coerced, or placed in fear or offered promises, favors, or rewards for any statement that he might make." Defendant asserts that this finding is not supported by competent evidence. We disagree.
Defendant does not challenge the trial court's extensive findings of fact which indicate that he was not subjected to threats, coercion, or tactics to induce fear, nor does he make any argument to this effect in his brief. Rather, he solely contends that his statements resulted from an improper promise made to him by Detective Jaynes. In support of this contention, defendant solely cites to the following exchange between Jaynes and defendant's trial counsel, which occurred on cross examination:
Q. When you first started talking with [defendant], did you tell him that it would be helpful for him to talk with you?
A. That's probably  not in those exact words.
Q. What did you tell him?
A. I always  and I'm trying to recall what I tell everyone when I'm interviewing them  that it's always best to tell me what's going on [in] a case, but that's about it.
Q. Did you say something like you couldn't help him if he didn't tell you what happened?
A. I probably did say that, yes.
Q. It'd be better for him if he told you what happened?
A. No, I never said better[.]
"For a confession to be held involuntary, the `improper inducement must promise relief from the criminal charge to which the confession relates, and not merely provide the defendant with a collateral advantage.'" State v. Shelly, 181 N.C. App. 196, 204, 638 S.E.2d 516, 523 (quoting State v. Gainey, 355 N.C. 73, 84, 558 S.E.2d 463, 471, cert. denied, 537 U.S. 896, 154 L. Ed. 2d 165 (2002)), disc. review denied, 361 N.C. 367, 646 S.E.2d 768 (2007). Here, we do not believe that Detective Jaynes's testimony regarding the very general statement he made to defendant at the start of questioning indicates that he promised defendant relief from a criminal charge. In fact, at the point in time in which Jaynes questioned defendant, he had not been charged, or threatened with being charged, for any crime. Furthermore, the trial court's finding was adequately supported by additional, unchallenged and binding findings of fact, which were based upon Jaynes's and Cates's respective testimony. Consequently, we overrule this assignment of error.
Next, defendant asserts that the trial court erred in making its findings of fact as to his mental ability because the court purportedly only considered Dr. Vance's testimony and not Dr. Walter's and because it took Dr. Vance's testimony out of context and minimized his mental deficits. Consequently, he asserts the trial court's findings of fact regarding his mental ability were not supported by competent evidence. We disagree.
With regard to defendant's mental deficits and the expert testimony, the trial court's findings state:
The Court further finds as a fact that the defendant, when examined by forensic psychiatrist Charles Vance, M.D[.], Ph.D, was found by Dr. Vance to have thinking that was linear and goal-directed with no evidence of looseness of associations, flight of ideas, or thought-blocking or any evidence of delusional thinking.
At the time of the interview with Dr. Vance, defendant was oriented to person, place, and time, with intact memory for recent and remote events, with intellectual functioning in the low-average to below-average range.
The defendant does have mild mental impairment. The defendant's educational history involves special education classes because he could not "read or write very good."
The defendant was at the time of this incident involving the death of Todd Douglas in the ninth grade at Hillside High School and had to repeat second and fourth grades.
Defendant was labeled a learning disabled student and was eligible for services for educable mentally disabled individuals but was not given those services through the school system for reasons that do not appear of record.
The defendant was functioning in the borderline to low-average range of cognitive ability, with specific learning disabilities in the areas of basic writing, written expression, basic reading and reading comprehension.
The defendant was diagnosed as borderline intellectual functioning and has intellectual impairment, with an IQ in the low-average to below-average range.
The defendant is competent to stand trial and meets all the competency requirements of North Carolina General Statute [.] 15(a)-1001.
At the outset, we note that, to a certain extent, defendant appears to argue that the trial court failed to make findings of fact encompassing all of the evidence presented as to his mental abilities. "When there is a material conflict in the evidence on voir dire, the [trial court] must make findings of fact resolving any such material conflict." State v. Lang, 309 N.C. 512, 520, 308 S.E.2d 317, 321 (1983). "However, these findings of fact need not summarize all of the evidence presented at the suppression hearing." State v. Ortez, 178 N.C. App. 236, 247, 631 S.E.2d 188, 196-97 (2006), appeal dismissed and disc. review denied, 361 N.C. 434, 649 S.E.2d 642 (2007).
Dr. Walter and Dr. Vance were the only expert witnesses to testify as to defendant's mental abilities at the suppression hearing and at trial. Dr. Walter qualified her testimony by stating that she had only seen defendant on one occasion, seven years prior to trial, and that she had only administered "a screening test [and] . . . not a full IQ test." Her testing indicated that defendant scored "in the mild mental impairment range" for verbal ability and that he scored in the "low average range" for nonverbal ability. Dr. Walter also stated that defendant's school records indicated that he had taken more extensive tests in both the first and third grades, which showed that his mental ability was somewhere between borderline and mild mental impairment. These tests showed that defendant's I.Q. was arguably in the range of 60 to 72, and Dr. Walter stated that I.Q. is very stable after age five.
Dr. Vance testified that he diagnosed defendant with "borderline intellectual functioning," but that this diagnosis was provisional because some of defendant's school records indicated that his IQ might be around 60, placing him in the range of "mild mental retardation." Dr. Vance also testified that defendant met the criteria for "learning disabilities that are technically titled reading disorder and disorder of written expression[,]" and that he did not perform an I.Q. test. However, Dr. Vance stated that defendant appeared "to have an adequate understanding of his legal situation and an adequate understanding of courtroom personnel and procedures." In addition, defendant could adequately remember and relay remote and recent events. Furthermore, Dr. Vance concluded that defendant was competent to stand trial.
Though the trial court's findings of fact do not specifically refer to Dr. Walter by name, after carefully reviewing the content of her testimony, it is clear that the court not only considered her testimony, but that it also based some of its findings upon it. Furthermore, both experts' testimony tended to show that defendant's mental ability was somewhere between the low-average range and mild mental impairment and that a full I.Q. assessment had not been performed on defendant since 1988. Nothing in this testimony supports defendant's arguments that the trial court took Dr. Vance's testimony out of context or that the court minimized his intelligence deficits.[5] In sum, sufficient competent evidence exists to support the trial court's findings of fact regarding defendant's mental ability; consequently, we overrule this assignment of error.

ii. Conclusions of Law
Next, defendant argues that the aforementioned purported promise that Jaynes made to him, coupled with his "intelligence deficits[,]" rendered his statements involuntary and made his waiver of his Miranda rights "involuntary and unknowing." We disagree.
"The determination of whether defendant's statements are voluntary and admissible `is a question of law and is fully reviewable on appeal.'" State v. Maniego, 163 N.C. App. 676, 682, 594 S.E.2d 242, 245-46 (quoting State v. Greene, 332 N.C. 565, 580, 422 S.E.2d 730, 738 (1992)), appeal dismissed and disc. review denied, 358 N.C. 737, 602 S.E.2d 369-70 (2004). The test for voluntariness in North Carolina is the same as the federal test. If, looking to the totality of the circumstances, the confession is "the product of an essentially free and unconstrained choice by its maker," then "he has willed to confess [and] it may be used against him"; where, however, "his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process."
State v. Hardy, 339 N.C. 207, 222, 451 S.E.2d 600, 608 (1994) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 225-26, 36 L. Ed. 2d 854, 862 (1973)) (citation omitted). In determining whether a confession was voluntary, this court considers the totality of the circumstances. Maniego, 163 N.C. App. at 682, 594 S.E.2d at 246. Factors this Court considers include:
whether defendant was in custody, whether he was deceived, whether his Miranda rights were honored, whether he was held incommunicado, the length of the interrogation, whether there were physical threats or shows of violence, whether promises were made to obtain the confession, the familiarity of the declarant with the criminal justice system, and the mental condition of the declarant.
Hardy, 339 N.C. at 222, 451 S.E.2d at 608 (1994). Additional factors include: "(1) the youth of the accused, (2) the accused's lack of education, (3) the length of detention, (4) the nature of the questioning, and (5) the use of physical punishment, such as deprivation of food or sleep." State v. McKinney, 153 N.C. App. 369, 373, 570 S.E.2d 238, 242 (2002).
Miranda requires that, prior to questioning, a defendant be informed that he "has the right to remain silent, that anything he says can be used against him, . . . [and] that he has a right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning . . . ." Additionally, a defendant must be informed of his right to an attorney during questioning.

State v. Lee, 148 N.C. App. 518, 521, 558 S.E.2d 883, 886, (quoting Miranda v. Arizona, 384 U.S. 436, 479, 16 L. Ed. 2d 694, 726 (1966)) (alteration in original), appeal dismissed, 355 N.C. 498, 564 S.E.2d 228-29, cert. denied, 537 U.S. 955, 154 L. Ed. 2d 305 (2002). "In addition to the above-mentioned constitutional rights, our legislature has granted to juveniles the right to have a parent, guardian or custodian present during questioning." State v. Miller, 344 N.C. 658, 666, 477 S.E.2d 915, 920 (1996). However, "the rule of Miranda applies only where a defendant is subjected to custodial interrogation." State v. Gaines, 345 N.C. 647, 661, 483 S.E.2d 396, 404, cert. denied, 522 U.S. 900, 139 L. Ed. 2d 177 (1997). Likewise, law enforcement must inform a juvenile that he "has a right to have a parent, guardian, or custodian present during questioning" in accordance with N.C. Gen. Stat. § 7B-2101(a)(3), only when he is being subjected to custodial interrogation. See, e.g., id. 483 S.E.2d at 405 (stating that the additional statutory protection for juveniles applies "only to statements obtained from a juvenile defendant as the result of custodial interrogation").[6] A juvenile may waive his Miranda and statutory rights, but the State bears the burden of proving that he knowingly and voluntarily waived these rights. Lee, 148 N.C. App. at 523, 558 S.E.2d at 887. In addition, pursuant to statute, prior to "admitting into evidence any statement resulting from custodial interrogation" of a juvenile, the court must find "that the juvenile knowingly, willingly, and understandingly waived [his] rights."[7] N.C. Gen. Stat. § 7B-2101(d). "Whether a waiver is knowingly and intelligently made depends on the specific facts of each case, including the defendant's background, experience, and conduct." State v. Brown, 112 N.C. App. 390, 396, 436 S.E.2d 163, 167 (1993), affirmed per curiam, 339 N.C. 606, 453 S.E.2d 165-66 (1995). In making this determination, courts consider the totality of the circumstances. State v. Fisher, 171 N.C. App. 201, 209, 614 S.E.2d 428, 433 (2005), cert. denied, 361 N.C. 223, 642 S.E.2d 711 (2007).
Based on its findings of fact, the trial court concluded: One, that the initial interview of the defendant at the Durham Police Department by Detective Jaynes was a non-custodial interview and the defendant was not restrained in any way and was free to leave at any time.
Two, that the statements made to Detective Jaynes by the defendant specifically including statements, Exhibit Numbers 1 and 2, were freely, voluntarily, and knowingly made by the defendant without any threat, coercion, or promise of reward or favor.
Three, that the defendant was given his Constitutional rights by Sergeant Cates, pursuant to North Carolina General Statute 7(b)-2001 01(a), the Juvenile Miranda Rights, as appears in State's Exhibit Number 3, that the defendant fully understood each of his rights in regards to that exhibit, and freely and knowingly and voluntarily and consensually waived those rights and agreed to talk with Sergeant Cates without a lawyer present and without a parent, guardian, or custodian present.
Four, that the statements of the defendant to Sergeant Cates, including specifically State's Exhibit Number 4, the 14 paged document offered by the State, signed by the defendant, was freely, knowingly, voluntarily, [and] consensually made to Sergeant Cates without any threat, coercion, or promise of reward or favor.
Five, that any mental impairment that the defendant had did not interfere with his ability to understand his Constitutional rights, waive those rights, and make a voluntary statement to law enforcement officers.
At the outset, we note that in his brief, defendant does not challenge the trial court's findings and conclusions that he was not in custody when he gave his first two statements to Jaynes. Furthermore, during oral arguments, defense counsel specifically conceded that the first two statements were not made in a custodial setting. Consequently, while we consider defendant's argument as to whether all three statements were voluntarily given, we only consider defendant's argument concerning the invalid waiver of his Miranda rights as it pertains to his third statement.
As the trial court's binding findings of fact indicate, defendant was seventeen years old and in the ninth grade when he was questioned. Neither Jaynes nor Cates engaged in any shows of force with defendant, nor did they place defendant under arrest or restraint prior to him making the statements. No improper promises were made to induce defendant into making his statements. Defendant did not ask for a break or for water, and both officers testified that they offered him food and drink.[8]
Jaynes did not inform defendant of his Miranda rights or his statutory rights; however, given that defendant was not in custody, he was not required to do so. Cates did inform defendant of his Miranda and statutory juvenile rights prior to questioning; specifically, Cates read the Durham Police Department's Juvenile Rights Warning and Waiver form aloud to defendant. This form contains four statements pertaining to a juvenile defendant's rights, which state:
1. You have the right to remain silent.
2. Anything you say can be and may be used as evidence against you in court.
3. You have the right to have a parent, guardian, or custodian present during questioning.
4. You have the right to talk with a lawyer before questioning and to have a lawyer with you while you are being questioned. If you are not represented by a lawyer and you want a lawyer before or during questioning, one will be appointed to represent you at no cost before any questioning.
The form also has four questions pertaining to the waiver of said rights which state:
1. Do you understand each of these rights I have explained to you?
2. Having these rights in mind, do you now wish to answer questions?
3. Do you now wish to answer questions without a lawyer present?
4. Do you now wish to answer questions without your parent, guardian, or custodian present?
Cates testified that: defendant appeared to understand these questions and what he was saying; defendant did not ask him any questions about his rights; he showed defendant the form, but did not ask defendant to read the content back to him or to repeat it in his own words; defendant verbally indicated "yes" to all of the questions; and defendant did not ask him to repeat any questions. Jaynes testified that he was present when Cates read defendant his rights and when defendant waived them. He stated that defendant indicated that he understood his rights and that he answered "yes" to all four questions waiving his rights. Cates further testified that once he finished going over these rights with defendant, he asked defendant to sign the form to indicate that he had advised him of his rights, and defendant printed his name and dated the form at the bottom.
Further, as the trial court's findings state, defendant did not request to speak to an attorney or to stop either interview. Nor did defendant ask to see or speak with his family until after the questioning was finished, and Cates honored his request. Jaynes stated that when he questioned defendant, defendant was quiet and appeared nervous, but that he was very cooperative. Cates stated that during his conversations with and questioning of defendant, he "very much" appeared to understand Cates and responded appropriately, especially with regard to the statement he gave, during which defendant "recalled remarkable details." Cates further testified that defendant "appeared to be completely in control of his faculties," and in his opinion, "[defendant] did not appear to be mentally impaired[.]" He stated that defendant "genuinely seemed remorseful[,]" and that defendant did not appear to be under the effects of drugs and alcohol.
At most, the trial court's findings regarding defendant's mental deficiencies establish that defendant was mildly mentally impaired. "A defendant's youth or subnormal mental capacity does not necessarily render him incapable of waiving his rights knowingly and voluntarily." State v. Flowers, 128 N.C. App. 697, 701, 497 S.E.2d 94, 97 (1998) (citing State v. Fincher, 309 N.C. 1, 8, 305 S.E.2d 685, 690 (1983)). For example, in Fincher, expert psychiatric testimony was presented showing that the seventeen-year-old defendant suffered from "schizophreniform disorder[,]" that his I.Q. was somewhere between 50 and 65, and that the defendant was "functionally illiterate and could not have understood the consent to search form that he signed[,]" which gave police permission to search his bedroom. Fincher, 309 N.C. at 7, 305 S.E.2d at 690. Noting that the "controlling legal principles" regarding the "voluntariness of an inculpatory statement made during custodial interrogation" are "equally apposite to situations where the voluntariness of a consent to search is at issue[,]" the Supreme Court of North Carolina held that the defendant did "voluntarily, willingly and understandingly" consent to the search of his bedroom. Id. at 8-9, 305 S.E.2d at 690-91. In addition, "[a]n interrogating officer need not explain the Miranda rights in any greater detail than what is required by Miranda, even when the suspect is a minor." Flowers, 128 N.C. App. at 700, 497 S.E.2d at 96. "Nor is there a statutory duty to explain the juvenile rights in greater detail than what is required by" section 7B-2101. Id. at 700, 497 S.E.2d at 97. Furthermore, our appellate Courts have repeatedly upheld the waiver of Miranda rights by juvenile defendants with subnormal mental functioning. See, e.g., id. at 701-03, 497 S.E.2d at 97-98 (holding that juvenile defendant with a full scale I.Q. of 56, a verbal I.Q. of 48, and a seventh grade education, knowingly, voluntarily, and intelligently waived his rights); Brown, 112 N.C. App. at 393, 397, 436 S.E.2d at 165, 168 (holding that fifteen-year-old juvenile with an I.Q. between 49 and 65 voluntarily, knowingly, and intelligently waived his Miranda and juvenile rights); see also State v. Jones, 153 N.C. App. 358, 362-63, 366-68, 570 S.E.2d 128, 132, 134-36 (2002) (stating that juvenile defendant with full scale I.Q. scores somewhere between 56 and 72 could validly waive his constitutional rights).
Here, the trial court's findings indicate that defendant's mother and family wanted to gain access to defendant during questioning and inquired about obtaining an attorney for him, but that they were denied access to him by Jaynes, who informed them that defendant had to make these requests himself. Prior to oral argument, defendant submitted a "Memorandum of Additional Authorities" to this Court, which included, inter alia, In re Andre M., 207 Ariz. 482, 88 P.3d 552 (Ariz. 2004). In that case, the Arizona Supreme Court determined that a juvenile's confession was not voluntary where his mother had been denied access to him during his interrogation. Id. at 486-87, 88 P.3d at 556-57.
However, the Arizona Supreme Court's decision does not lead to the conclusion that defendant's confession here was not voluntarily given for several reasons. First, that court's precedent does not bind this Court. Next, Arizona courts have explicitly held that the presence of the juvenile's parent or the parent's consent to a waiver is one of the factors to be considered in determining whether the juvenile made his statement voluntarily and whether the juvenile comprehended his rights. Id. at 485, 88 P.3d at 555. This is not the law in North Carolina. In fact, North Carolina courts have explicitly concluded that absent a juvenile invoking his Miranda or statutory rights, law enforcement need not inform the juvenile that his parents or an attorney are present at the police station because "notifying defendant of such facts does not come within the aegis" of the juvenile statute or Miranda, nor does the failure to notify him of these facts render his "confession involuntary as a matter of law or otherwise inadmissible."Gibson, 342 N.C. at 148-49, 463 S.E.2d at 197-98; see also Brown, 112 N.C. App. 392-93, 397, 436 S.E.2d at 165, 167-68 (fifteen-year-old with an I.Q. between 49 and 65 validly waived his rights where he did not ask for a parent or lawyer even though his mother was present at the police department during the interview process). Furthermore, North Carolina law only mandates the presence of a parent, guardian, or custodian during a custodial interrogation when the juvenile is under fourteen years of age, and these individuals cannot waive the juvenile's rights. N.C. Gen. Stat. § 7B-2101(b); see also State v. Branham, 153 N.C. App. 91, 98-99, 569 S.E.2d 24, 29 (2002) (holding that mother could not waive juvenile defendant's right to have her present during custodial interrogation when juvenile had invoked his right to her presence).
In sum, after considering the totality of the circumstances here, we hold that the trial court did not err by concluding that defendant's three statements were voluntarily given and that he validly waived his Miranda rights as well as his statutory right to the presence of a parent, guardian, or custodian prior to giving his third statement.

B. Trial Court's Questioning of Witnesses
Next, defendant argues that the trial court failed to maintain its impartiality by posing questions to certain witnesses at trial, which impermissibly expressed the court's opinion to the jury as to the weight of the evidence and/or the credibility of the witnesses in violation of state and federal constitutional law and N.C. Gen. Stat. § 15A-1222. Specifically, defendant points to questions posed to: Robert Barbour, an assistant principal of Hillside High School; Sheldon Stuart; Donna Myers, a crime scene investigator; Angela Ashby, a forensic investigator; Charles McClelland, an SBI agent; and Neil Morin, an SBI agent. As a result, defendant asserts that he is entitled to a new trial. We disagree.
"The judge may not express during any stage of the trial, any opinion in the presence of the jury on any question of fact to be decided by the jury." N.C. Gen. Stat. § 15A-1222 (2007). However, "`[t]he court may interrogate witnesses, whether called by itself or by a party,' and may question a witness to clarify confusing or conflicting testimony." State v. Bethea, 173 N.C. App. 43, 51, 617 S.E.2d 687, 693 (2005) (quoting N.C. Gen. Stat. § 8C-1, Rule 614(b) (2003)).
Numerous cases recognize the well established rule that the judge may, on his own prerogative, participate in the examination of witnesses. In fact, the trial judge has a duty to question a witness in order to clarify the testimony being given, or "to elicit overlooked, pertinent facts." However, the trial judge must carefully scrutinize his questioning to insure that it does not impermissively suggest an opinion as to the guilt or innocence of a criminal defendant, the credibility of a witness, or any other matter which must be determined by a jury.
State v. Efird, 309 N.C. 802, 808-09, 309 S.E.2d 228, 232 (1983) (quoting State v. Monk, 291 N.C. 37, 50, 229 S.E.2d 163, 171 (1976)) (citations omitted). "[A]n alleged improper statement will not be reviewed in isolation, but will be considered in light of the circumstances in which it was made. Furthermore, [a] defendant must show that he was prejudiced by a judge's remark." State v. Weeks, 322 N.C. 152, 158, 367 S.E.2d 895, 899 (1988) (citation omitted). "Such questioning of witnesses amounts to prejudicial error only when a jury could reasonably infer that by their tenor, frequency, or persistence the questions and comments intimated an opinion as to the witnesses' credibility, the defendant's guilt, or as to a factual controversy to be resolved by the jury." State v. Redfern, 98 N.C. App. 129, 131, 389 S.E.2d 846, 847 (1990).
Upon close examination of the record on appeal, we conclude that the questions posed by the trial court did not intimate any opinion as to the weight of the evidence, the credibility of the witnesses, or defendant's guilt. Accordingly, we overrule, this assignment of error.

C. Instruction on Involuntary Manslaughter
Finally, defendant argues that the trial court erred by failing to instruct the jury on involuntary manslaughter as a lesser included offense of first degree murder. We disagree.
Involuntary manslaughter and second-degree murder are lesser-included offenses supported by an indictment charging murder in the first degree. A defendant is entitled to a charge ona lesser-included offense when there is some evidence in the record supporting the lesser offense. Conversely, "[w]here the State's evidence is positive as to each element of the offense charged and there is no contradictory evidence relating to any element, no instruction on a lesser included offense is required."
State v. James, 342 N.C. 589, 594, 466, S.E.2d 710, 713-14 (1996) (quoting State v. Thomas, 325 N.C. 583, 594, 386 S.E.2d 555, 561 (1989)) (alteration in original) (citations omitted).
"Second-degree murder `is the unlawful killing of a human being with malice but without premeditation and deliberation.'" State v. Bruton, 344 N.C. 381, 389, 474 S.E.2d 336, 342 (1996) (quoting State v. Fleming, 296 N.C. 559, 562, 251 S.E.2d 430, 432 (1979)) "[I]t is well established that malice and unlawfulness may be inferred from the intentional use of a deadly weapon which proximately results in a death." State v. Shuford, 337 N.C. 641, 650, 447 S.E.2d 742, 748 (1994).
"Involuntary manslaughter is the unlawful killing of a human being without malice, without premeditation and deliberation, and without intention to kill or inflict serious bodily injury." State v. Powell, 336 N.C. 762, 767, 446 S.E.2d 26, 29 (1994). Involuntary manslaughter has also been defined as "the unintentional killing of a human being without malice, proximately caused by (1) an unlawful act not amounting to a felony nor naturally dangerous to human life, or (2) a culpably negligent act or omission." Id.
Here defendant was tried and convicted of second degree murder under acting in concert theory, which provides: [I]f "two persons join in a purpose to commit a crime, each of them, if actually or constructively present, is not only guilty as a principal if the other commits that particular crime, but he is also guilty of any other crime committed by the other in pursuance of the common purpose . . . or as a natural or probable consequence thereof."
State v. Erlewine, 328 N.C. 626, 637, 403 S.E.2d 280, 286 (1991) (quoting State v. Westbrook, 279 N.C. 18, 41-42, 181 S.E.2d 572, 586 (1971), death sentence vacated, 408 U.S. 939, 33 L. Ed. 2d 761 (1972)) (alterations in original).
Here, all of the evidence showed that defendant joined in a common purpose or plan with others to intentionally fire gunshots at Douglas, and multiple gunshots were intentionally fired by multiple shooters. One of these shots proximately caused Douglas's death, thereby establishing malice, and there was no evidence presented that any of the shots were fired unintentionally. Thus, the trial court properly declined to instruct the jury on involuntary manslaughter as the evidence did not support it. See State v. Eubanks, 151 N.C. App. 499, 504, 565 S.E.2d 738, 741-42 (2002) (holding that the trial court properly declined to instruct the jury on involuntary manslaughter where there was no evidence that the gunshot which caused the victim's death was fired unintentionally); see also Bruton 344 N.C. at 393, 474 S.E.2d at 344 (holding that the trial court properly declined to instruct the jury on involuntary manslaughter where the evidence was undisputed that the person with whom defendant was acting in concert intentionally fired the shot that killed the victim). As a result, we overrule this assignment of error.

D. Remaining Assignments of Error
Defendant makes no arguments regarding his remaining assignments of error in his brief; consequently, we treat them as abandoned. N.C.R. App. P. 28(b)(6).

III. Conclusion
In sum, after careful review of the arguments properly brought forth by defendant, we find no error.
No error.
Judges CALABRIA and HUNTER, Robert N., Jr., concur.
Report per Rule 30(e).
NOTES
[1] The judgment was signed on 1 April 2008, but does not contain a file stamp.
[2] In 2005, Sheldon had long hair and testified at trial and was referred to by defendant as the "twin with the hair". Shelton had short hair and did not testify.
[3] Douglas was also known as "C-Style".
[4] In his brief, defendant states that both Dr. Walter's and Dr. Vance's testimony was "similar to that presented . . . during the suppression motion hearing." Given that defendant challenges the trial court's findings and conclusions pertaining to these two witnesses' testimony on appeal, we discuss the content of their respective testimony infra.
[5] In addition, we note that defendant does not challenge the trial court's findings regarding Jaynes's and Cates's perceptions as to his mental capabilities. These findings indicate that neither officer noticed anything particularly deficient regarding his intellectual functioning. We further note that an officer's opinion regarding a defendant's mental capacities at the time of the confession is relevant to the voluntariness of the confession where, as here, said opinion is based on the officer's personal perception at the time the confession is given. State v. Johnson, 136 N.C. App. 683, 693-94, 525 S.E.2d 830, 836-37 (2002); see also State v. Jones, 342 N.C. 523, 537-38, 467 S.E.2d 12, 21 (1996).
[6] While Gaines and some of the other cases cited in this opinion specifically address a juvenile's statutory rights under N.C. Gen. Stat. § 7A-595, which was the prior statute governing "Interrogation procedures" for juveniles, we note that section 7A-595 and the current statute N.C. Gen. Stat. § 7B-2101 are substantially similar. Compare N.C. Gen. Stat. § 7A-595 (1995) with N.C. Gen. Stat. § 7B-2101 (2007).
[7] Here, the trial court determined that defendant "freely and knowingly and voluntarily and consensually waived" his rights. The trial court did not use the word "understandingly". Defendant does not argue that this was error in his brief, and when his counsel was questioned about this at oral arguments, she conceded that this was a mere technical difference and not reversible error. Furthermore, our Supreme Court has "noted that the `purpose of the requirement . . . is to establish the basis for admitting the statement' . . . [and that] Court has found no error where the orders of trial courts holding confessions of juveniles to be admissible have been consistent with the purpose of the statute, but have not included the precise statutory words that the defendants `knowingly, willingly and understandingly' waived their rights." State v. Gibson, 342 N.C. 142, 147, 463 S.E.2d 193, 197 (1995) (quoting State v. Small, 328 N.C. 175, 187, 400 S.E.2d 413, 419 (1991)).
[8] Further, we note that, though the trial court did not make findings to this effect, the evidence presented tended to show that: (1) defendant remained in the conference room for approximately four hours; and (2) defendant was arrested in February 2005 and received a citation in October 2005, he had applied for and received appointed counsel in both instances, and the cases were later dismissed.