STATE OF NORTH CAROLINA v. ANGELITO REYES MANIEGO, Defendant

No. COA03-340

(Filed 20 April 2004)

**1. Homicide— first-degree murder—short form indictment**

The short form indictment for first-degree murder is constitutional.

**2. Confessions and Incriminating Statements— voluntary waiver of rights—response to plea bargain request**

Statements to officers were properly admitted where defendant asked about a plea bargain, an officer said that all he could do would be to tell the D.A. of defendant's cooperation, and the offi-

cer later called defendant a liar. The findings support the conclusion that defendant knowingly waived his right to remain silent.

**3. Criminal Law— opening argument—presence at scene**

Defense counsel did not concede guilt in an opening argument which concerned presence at the scene.

**4. Criminal Law— instructions—acting in concert—properly defined**

The trial court's instruction, taken as a whole, properly defined acting in concert.

**5. Criminal Law— instructions—acting in concert—evidence sufficient**

An instruction on acting in concert was supported by the evidence.

Appeal by defendant from judgments entered 12 February 2002 by Judge Charles H. Henry in Superior Court in Onslow County. Heard in the Court of Appeals 4 December 2003.

*Attorney General Roy Cooper, by Assistant Attorney General Thomas G. Meacham, Jr., for the State.*

*Margaret Creasy Ciardella, for defendant-appellant.*

HUDSON, Judge.

On 14 November 2000, the Onslow County Grand Jury returned indictments charging defendant, Angelito Reyes Maniego, with first-degree murder, felonious larceny, felonious possession of stolen property, robbery with a dangerous weapon, first-degree kidnapping, conspiracy to commit robbery with a dangerous weapon, conspiracy to commit first-degree kidnapping, and conspiracy to commit murder. Defendant was tried capitally during the 14 January through 11 February 2002 Criminal Sessions of Superior Court in Onslow County. The jury convicted defendant of one count each of first-degree murder, felonious larceny, first-degree kidnapping, robbery with a dangerous weapon, and conspiracy to commit robbery with a dangerous weapon. After a capital sentencing hearing, defendant was sentenced to life imprisonment without parole for the first-degree murder conviction. The trial court then imposed a consolidated sentence of 95 to 123 months imprisonment for the robbery with a dangerous weapon and felonious larceny convictions. For the first-degree kidnapping

conviction, the trial court sentenced defendant to a term of 125 to 159 months, and ordered all sentences to run consecutively. Defendant appeals. For the following reasons, we find no error.

The State's evidence at trial tended to show that, before he was killed, twenty-two year old David Brandt shared an apartment with his sister. On the night of 13 August 2000, David was supposed to have dinner with his parents, who became worried when he did not arrive at their house. Later, when David did not return to his apartment, his sister began to worry. At approximately 4:00 a.m. the next morning, David's sister and parents filed a missing person's report with the Jacksonville Police Department. About an hour later, David's truck was found abandoned in a Wal-Mart parking lot.

On the morning of 17 August 2000, law enforcement officers found the partially decomposed body of David Brandt in a wooded area near Jacksonville. The body was lying next to a tree, face up. The face was wrapped with electrical tape with a bulge at the mouth. The body had suffered multiple stab wounds.

Dr. Christopher Ingram, an expert in forensic pathology, participated in the autopsy. He testified that electrical tape covered the victim's head, extending from just below the eyes to below the chin, wrapping completely around the victim's head several times. Upon removing the tape from the head, he found a blue racquetball lodged in the mouth. Dr. Ingram also found bruises on both arms consistent with someone grabbing or holding the victim, and noted that the wrists had been bound, possibly with handcuffs. Dr. Ingram testified that he observed approximately thirty-one stab wounds to the neck and upper chest region, several of which were fatal. Although Dr. Ingram testified that suffocation by the tape and ball was a possible cause of death, he opined that the stab wounds were the more likely cause.

Jose Quesada, assistant security director at the Jacksonville Mall, knew the victim as one of the managers at Aladdin's Castle, a video arcade at the mall. Mr. Quesada also knew the defendant, who used to work in the mall. Mr. Quesada testified that he saw the defendant almost every day at the mall, usually at Aladdin's Castle. On Sunday 13 August 2000, at 6:30 p.m., Mr. Quesada saw the victim leave the mall carrying his bank deposit bags. Mr. Quesada also saw the defendant and Clifford Miller, who had been sitting on a bench outside the mall exit, approach the victim and walk with him to his truck. All three men got in the truck and drove off.

On 14 August 2000, the victim's father telephoned Juan Avila, who was working as manager of Aladdin's Castle, and told him that David was missing. Mr. Avila called the bank and found out that David had not made a $2688.25 deposit the previous evening. Mr. Avila also knew the defendant from the arcade, and sometimes saw him with Clifford Miller. Mr. Avila testified that no one associated with Aladdin's Castle permitted either defendant or Clifford Miller to take money belonging to Aladdin's Castle.

Michelle Nevitt, who also worked at Aladdin's Castle, testified that she saw the defendant there every day talking to David and she saw David give defendant rides in his truck on numerous occasions. When she left the mall at 6:00 p.m. on 13 August 2000, Ms. Nevitt saw the defendant and Clifford Miller smoking outside of the mall. She testified that earlier that afternoon, defendant had been rude with her after she told him to pay the victim the money defendant owed him.

David's sister, Laura Hingula, worked at another store in the mall and shared an apartment with him. She knew that her brother and defendant were friends, but she did not like defendant. On 13 August 2000, at around 4:30 p.m., David told Laura that he was going to take the deposits to the bank after he closed and then go to their parents' house for supper. At 6:15 that evening as she was leaving the mall, Laura saw her brother closing the arcade. As she left, she saw defendant and Miller outside the mall. She became worried when her brother did not arrive home by 2:00 a.m. the following morning, and later found out that he had not appeared at their parents' house for dinner.

Toni Cinotti testified that he worked at a Circle K convenience store in Jacksonville. On 13 August 2000, he went to work at 11:10 p.m. relieving Pam Miller, Clifford Miller's wife. About one hour later, defendant and Miller came into the store. Miller had a blue backpack with him. Cinotti testified that it was unusual to see Miller at that hour because he was usually home, and that Miller appeared "clammy," winded, out of breath, nervous, and scared. Miller bought a drink and then left the store.

Pam Miller testified that on 13 August 2000, she finished her shift at the Circle K, and went home. That night, Clifford Miller did not get home until sometime between 1:00 and 2:00 a.m. The next night, Clifford said he wanted a pizza and asked Pam to get his wallet from his backpack. She opened the backpack and found it full of money.

Knowing that the money did not belong to them, she confronted her husband and told him to get rid of it. She found more money hidden in the house and called the police.

Detective Kaderbek was investigating the missing person report on 14 August 2000. He knew that David's truck had been found and that money from Aladdin's Castle was missing. Because Mr. Quesada had seen the victim leave the mall in the company of two men, one of whom was defendant, Det. Kaderbek contacted defendant and asked him to come to the police station for an interview. Defendant agreed, and went in on 15 August 2000. During the interview, defendant stated that he went to the mall to ask David for a ride and that David gave him and "Cliff" a ride home, dropped them off and left, and that was the last time he saw David. Defendant stated that he and Miller played video games at Miller's house until Miller's wife got home from work, after which he left. Det. Kaderbek allowed defendant to leave after the interview, but he asked defendant not to speak to Miller until the police could talk to him.

Pam Miller was also interviewed on 15 August 2000. She stated that no one was home when she returned from work the night of 13 August 2000. Det. Kaderbek and other officers searched Miller's residence, where they found $892 under a sofa cushion and $315.41 in a tin can. Miller said defendant gave him the money. While the police were at Miller's house, defendant called Miller on the telephone. Defendant asked Miller if he had talked to the police yet, and Miller said no. Defendant told Miller to stick with their original story that David dropped them off and that was the last time they saw him. At the request of police, Miller invited defendant to his house. When defendant arrived, both he and Miller were arrested.

At this point, Det. Kaderbek read defendant his *Miranda* rights, which defendant waived and agreed to be interviewed. After initially making some inconsistent statements, defendant stated that when David left the mall, he had three bank deposit bags. David, defendant and Miller got into David's truck and Miller asked David to take them to Wal-Mart. Miller then pulled out a knife and stuck it in David's side. Then they stopped at a school parking lot where defendant moved into the driver's seat with David in the middle and Miller in the passenger's seat. Defendant had planned to drive to Greenville, but got lost, so they stopped at a wooded area and got out of the truck. They told David to remove his shirt, then handcuffed him and led him into the woods, where they handcuffed him around a tree and removed his pants. They then placed a ball in his mouth and taped his face. David

started struggling, then passed out. Miller then stabbed David about thirty times in the neck and throat. They left in David's truck, cleaned it and parked it in a Wal-Mart parking lot. When defendant was arrested, he had $635.96 on his person and another $407 was found at his residence.

Defendant presented no evidence.

## I.

[1] First, defendant argues that the short form indictments used to indict him for first-degree murder were unconstitutional as they failed to allege all of the elements of first-degree murder. In *State v. Braxton*, 352 N.C. 158, 531 S.E.2d 428 (2000), *cert. denied*, 531 U.S. 1130, 148 L. Ed. 2d 797 (2001), our Supreme Court examined the validity of short form indictments in light of the United States Supreme Court's decisions in *Jones v. United States*, 526 U.S. 227, 143 L. Ed. 2d 311 (1999) and *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435 (2000), and concluded that the short form murder indictments are in compliance with the North Carolina and United States Constitutions. *Id.* at 175, 531 S.E.2d at 438. As we are bound by the decisions of the North Carolina Supreme Court, we overrule this assignment of error.

## II.

[2] Next, defendant argues that the trial court erroneously denied his motion to suppress statements he made to law enforcement officers and in allowing the subsequent admission of those statements at trial. Defendant contends that any statements he made to the officers were involuntary and the result of coercion. We disagree.

In reviewing a trial court's ruling on a motion to suppress, the trial court's findings of fact "are conclusive on appeal if supported by competent evidence, even if the evidence is conflicting." *State v. Eason*, 336 N.C. 730, 745, 445 S.E.2d 917, 926 (1994), *cert. denied*, 513 U.S. 1096, 130 L. Ed. 2d 661 (1995). In turn, the trial court's conclusions of law regarding whether defendant was in custody "must be legally correct, reflecting a correct application of applicable legal principles to the facts found." *State v. Fernandez*, 346 N.C. 1, 11, 484 S.E.2d 350, 357 (1997).

Here, the trial court made extensive findings of fact regarding defendant's interrogation. Among them, the court found as fact that defendant was advised of his *Miranda* rights, that defendant stated

that he understood his rights and was willing to waive those rights, that defendant waived those rights both orally and in writing, that defendant then gave the investigating officers an oral statement regarding the disappearance of David Brandt, and that defendant then gave the officers a written statement regarding the same. Defendant does not challenge any of these findings.

The determination of whether defendant's statements are voluntary and admissible "is a question of law and is fully reviewable on appeal." *State v. Greene*, 332 N.C. 565, 580, 422 S.E.2d 730, 738 (1992). A statement is admissible if it "was given voluntarily and understandingly." *State v. Schneider*, 306 N.C. 351, 355, 293 S.E.2d 157, 160 (1982). On review, "[t]he court looks at the totality of the circumstances of the case in determining whether the confession was voluntary." *State v. Jackson*, 308 N.C. 549, 581, 304 S.E.2d 134, 152 (1983). Factors to be considered include whether defendant was in custody, whether he was deceived, whether his *Miranda* rights were honored, whether he was held incommunicado, the length of the interrogation, whether there were physical threats or shows of violence, whether promises were made to obtain the confession, the familiarity of the declarant with the criminal justice system, and the mental condition of the declarant. *State v. Hardy*, 339 N.C. 207, 222, 451 S.E.2d 600, 608 (1994).

The defendant does not challenge the findings of fact of the superior court but does contend that considering the totality of the circumstances, his confession was coerced, and thus inadmissible, because of certain questioning tactics employed by Dets. Condry and Kaderbek. First, in response to defendant asking the detectives whether there is going to be a plea bargain, Det. Condry stated:

> I can't make deals with you, okay? The only thing I can make sure of is that the district attorney knows when me and you talked you cooperated with me fully. That's the best I can offer you. But for me to even say that to the district attorney or the judge, you've got to tell me the truth and you haven't so far.

Our Supreme Court has held that "[p]romises or other statements indicating to an accused that he will receive some benefit if he confesses do not render his confession involuntary when made in response to a solicitation by the accused." *State v. Richardson*, 316 N.C. 594, 604, 342 S.E.2d 823, 831 (1986). Additionally, our Courts have held that it is acceptable to tell the accused that his cooperation

will be made known to the district attorney. *State v. Williams*, 314 N.C. 337, 346, 333 S.E.2d 708, 715 (1985).

Defendant also contends that his confession was coerced because the detectives called him a "liar," told him that his story was "bull," and told him that they held his life in their hands. In *State v. Jackson*, 308 N.C. 549, 304 S.E.2d 134 (1983), our Supreme Court upheld the admission of the defendant's confession after investigators told him that "it would be best if the defendant would just tell the truth in the long run." *Id.* at 560, 304 S.E.2d at 150. Similarly, in *State v. Corley*, 310 N.C. 40, 311 S.E.2d 540, (1984), the trial court did not err by admitting defendant's statement after an officer told him that "things would be a lot easier on him if he went ahead and told the truth". *Id.* at 52, 311 S.E.2d at 547.

The trial court's findings support its conclusion that defendant freely, knowingly, understandingly, and voluntarily waived his right to remain silent and his right to counsel after being advised of his rights under *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966). The conclusions support the ruling denying defendant's motion to suppress. Thus, considering the totality of the circumstances, we conclude that the trial court did not err by admitting defendant's statements.

III.

**[3]** Next, defendant contends that the trial court committed reversible error by failing to inquire of defendant whether he knowingly, intelligently and voluntarily consented to concessions of guilt made by his attorney during opening statements in violation of *State v. Harbison*, 315 N.C. 175, 337 S.E.2d 504 (1985), *cert. denied*, 476 U.S. 1123, 90 L. Ed. 2d 672 (1986). We disagree.

To establish a *Harbison* claim, the defendant must first show that his trial attorney has made a concession of guilt. *State v. Strickland*, 346 N.C. 443, 488 S.E.2d 194 (1997), *cert. denied*, 522 U.S. 1078, 139 L. Ed. 2d 757 (1998). Here, defendant claims that the following from the opening statement violates *Harbison*:

Remember that Angelito Maniego is presumed innocent and this presumption follows him throughout this trial unless and until you're convinced that he committed these crimes, any one of them or all of them. He does not have to testify in the case or present any evidence of, and I think we've been over that with you. But you must consider, we ask you to consider any questions

that we ask witnesses and their answers in reaching your decision in this case. We contend to you further that there's no physical evidence putting Angelito Maniego at the scene of this killing by Clifford Miller of David Brandt. That there's no physical evidence put him in the vehicle with David Brandt and Clifford Miller. That there's no physical evidence at all connecting Angelito Maniego with these crimes. Angelito Maniego put himself in the vehicle with Clifford Miller and David Brandt. He put himself driving the vehicle, he put himself at the scene where David Brandt was murdered by Clifford Miller. Through his statements, you'll hear his testimony in this case and he did make three different statements. The first two are incomplete. The third one is the final version. It's the truth about his involvement in these crimes, and it will show to you that he did not aid and abet in the killing of David Brandt by Clifford Miller, nor did he act in concert with Clifford Miller to kill David Brandt. The fact that he's at the scene where these acts occurred is not enough for you to find him guilty of these crimes.

Defense counsel then concluded his opening statement by asking the jury to keep an open mind, and further states:

That's all we ask, and we feel that if you do, you will not find Angelito Maniego guilty of murder or these other charges.

Contrary to defendant's argument, we find no admission of guilt in this excerpt. At most, defense counsel admits the fact that defendant's statement places him at the scene of the crime, though he argues that the "fact that he's at the scene where these acts occurred is not enough for you to find him guilty of these crimes." Admitting a fact is not equivalent to admitting guilt. *State v. Wiley*, 355 N.C. 592, 620, 565 S.E.2d 22, 42 (2002), *cert. denied*, 537 U.S. 1117, 154 L. Ed. 2d 795 (2003). In addition, counsel's opening statement in its entirety is consistent with defendant's theory of the case, that he was not guilty because Clifford Miller committed the crimes. Thus, we conclude that there was no *Harbison* violation here, and accordingly we overrule this assignment of error.

IV.

**[4]** Finally, defendant argues that the trial court erred by instructing the jury on acting in concert, contending that there was insufficient evidence to support the instruction and that the instruction given was an incorrect statement of the law. We disagree.

**STATE v. MANIEGO**

[163 N.C. App. 676 (2004)]

On this point, the trial court instructed the jury as follows:

For a person to by guilty of a crime, it is not necessary that he, himself, do all the acts necessary to constitute the crime. If two or more persons join in a purpose, to commit a particular crime, each of them if actually or constructively present is not only guilty of that crime if the other commits the crime, but he's also guilty of any other crime committed by the other in pursuance of the common purpose, to commit the particular crime, or as a natural or probable consequence thereof. However, the mere presence of the defendant at the scene of a crime, even though he is in sympathy with a criminal act and does nothing to prevent its commission, does not make him guilty of the offense.

While defendant agrees that this is a correct statement of the law, he argues that the trial court did not identify this passage as the definition of acting in concert, and subsequently erred during the charge on each offense by stating that "the defendant, acting either by himself or acting in concert with another" rather than reciting "the defendant, acting by himself or together with someone else."

In reviewing jury instructions, our Supreme Court has noted that:

The charge of the court must be read as a whole . . ., in the same connected way that the judge is supposed to have intended it and the jury to have considered it . . . . It will be construed contextually, and isolated portions will not be held prejudicial when the charge as a whole is correct. If the charge presents the law fairly and clearly to the jury, the fact that some expressions, standing alone, might be considered erroneous will afford no ground for reversal.

*State v. Hooks*, 353 N.C. 629, 634, 548 S.E.2d 501, 505 (2001), *cert. denied*, 534 U.S. 1155, 151 L. Ed. 2d 1018 (2002) (citations omitted). Additionally,

If, when so construed, it is sufficiently clear that no reasonable cause exists to believe that the jury was misled or misinformed, any exception to it will not be sustained even though the instruction could have been more aptly worded.

*State v. Williams*, 299 N.C. 652, 660, 263 S.E.2d 774, 779-80 (1980). Here, in the charge as a whole, the trial court properly defined and conveyed to the jury the legal principle of acting in concert.

[5] We next consider whether the evidence supported this instruction, and we conclude that it did. The State's evidence tended to show that witnesses saw the victim leaving the mall with his bank deposit bags, and also saw him driving off in his truck with defendant and Clifford Miller. Other evidence showed that in the truck, Clifford Miller stuck a knife in the victim's side, and that defendant ordered Miller to stop the truck, so that defendant could take over the driving. Defendant drove the truck for over three hours, eventually stopping near a wooded area. Together, Defendant and Miller led the victim on a fifteen minute walk into the woods, where they handcuffed him to a tree, stripped off his clothes, and gagged him. After Miller stabbed the victim many more times, defendant helped clean up the truck and dispose of evidence in a dumpster. Defendant and Miller then split the money from the bank deposit bags and agreed on a story. Importantly, much of this evidence is from defendant's detailed description of the robbery and killing. Thus, we conclude that the evidence was sufficient to support the instruction on acting in concert, and conclude that this assignment of error lacks merit.

No error.

Judges TYSON and STEELMAN concur.