IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA22-231

Filed 21 February 2023

Onslow County, No. 18CRS054443

STATE OF NORTH CAROLINA

v.

JAIRO PALACIO PALACIO

Appeal by Defendant from judgment entered 1 April 2021 by Judge Charles H. Henry in Onslow County Superior Court. Heard in the Court of Appeals 19 October 2022.

*Attorney General Joshua H. Stein, by Assistant Attorney General Benjamin Szany, for the State-Appellee.*

*Appellate Defender Glenn Gerding, by Assistant Appellate Defender John F. Carella, for Defendant-Appellant.*

COLLINS, Judge.

Defendant Jairo Palacio[1] appeals from judgment entered upon a jury verdict of guilty of statutory rape of a child 15 years or younger, sexual activity by a substitute parent, incest, and two counts of indecent liberties with a child. Defendant

---

[1] The trial court allowed the State's motion to amend the indictment to read Jairo Palacio, but the judgment, appellate entries, and amended appellate entries identify Defendant as Jairo Palacio Palacio.

contends that (1) he is entitled to a new trial because the transcript for one day of the proceedings is missing; (2) the trial court erred by denying his motion to dismiss the incest charge; (3) the trial court erred by denying his motion to suppress; and (4) the case must be remanded to the trial court to correct a clerical error in the trial court's judgment. We conclude that Defendant is not entitled to a new trial and that the trial court did not err by denying his motion to suppress. However, we vacate Defendant's incest conviction and remand for resentencing, and remand for correction of a clerical error on the written judgment.

## I.    Procedural History and Factual Background

Mary,[2] a Columbian citizen, moved to Jacksonville, North Carolina, in April 2018 with her mother, father, and sister. Mary and her family lived with Defendant and his wife. Defendant's wife is Mary's mother's sister, making Defendant's wife Mary's aunt by blood and Defendant Mary's uncle by marriage. Because Mary's parents did not initially plan to stay permanently in the United States, Defendant began the process of legally adopting Mary.

One Tuesday in the summer of 2018, when Mary was 15 years old and Defendant was 42 years old, Mary, her mother, her sister, and Defendant were by the pool in the backyard. Mary went inside the house to get drinks; Defendant followed her into the kitchen and kissed her on the lips. The next day, Mary and her family

---

[2] Mary is a pseudonym used to protect the identity of the child victim.

were again at the pool; Mary went inside the house to use the bathroom. Defendant, who was already inside, pushed her through the doorway. Defendant touched her on the vagina over her swimsuit, made her touch him on his penis over his swimsuit, and pulled her hand inside his swimsuit. Defendant stopped after Mary began to cry and said, "No" loudly.

On 16 July 2018, Mary and her younger sister were home alone with Defendant. Mary was doing laundry in the garage when Defendant came in and grabbed her buttocks. When Mary turned around, Defendant grabbed her arms and tried to kiss her. Defendant pushed her to the ground and continued to try to kiss her. Defendant took off his pants and underwear and then took off Mary's pants and underwear. Defendant grabbed a condom and engaged in vaginal intercourse with Mary. After Defendant finished, Mary grabbed her little sister, went into her bedroom, and locked the door until Defendant left the house. Defendant left that same day to visit his family in Colombia. Mary did not immediately tell her family about these encounters out of fear that it would destroy her family's future. About two weeks after Defendant had left for Columbia, Mary told her father what happened, and he called the police.

As part of the subsequent investigation, the Child Advocacy Center conducted a forensic interview with Mary through an interpreter during which Mary detailed the encounters with Defendant. During the medical evaluation, Mary told the nurse practitioner that she was worried that she might be pregnant by Defendant. The

nurse practitioner conducted a genital exam of Mary and determined that, although there was no evidence of injury to Mary's hymen, Mary's symptoms and characteristics were consistent with the profiles of children who had been sexually abused.

Defendant was indicted for statutory rape of a child who was 15 years or younger, sexual activity by a substitute parent, three counts of indecent liberties with a child, incest, and obstruction of justice. Prior to trial, Defendant moved to suppress his inculpatory statements made at the Onslow County Sheriff's Office following his arrest. After an evidentiary hearing, the trial court orally denied the motion and subsequently entered a written denial order.

The case came on for trial on 1 March 2021. After all the evidence was presented, and prior to submitting the case to the jury, the trial court dismissed one count of indecent liberties with a child and the single count of obstruction of justice. The jury found Defendant guilty of the remaining charges. Prior to sentencing, the trial court dismissed the charge of sexual activity by a substitute parent. The trial court consolidated the remaining convictions into a single Class B1 felony. The trial court sentenced Defendant within the presumptive range to 192 to 291 months' imprisonment, ordered that Defendant register as a sex offender for a period of 30 years upon his release, and entered a permanent no contact order prohibiting Defendant from contacting Mary. Defendant timely appealed.

## II.    Discussion

### A. Missing Transcript

Defendant first contends that he is entitled to a new trial because the transcript for 2 March 2021 is missing, depriving him of meaningful appellate review.

"[W]hen an indigent defendant ha[s] entered notice of appeal, he is entitled to receive a copy of the trial transcript at State expense." *State v. Hobbs*, 190 N.C. App. 183, 185, 660 S.E.2d 168, 170 (2008) (citing N.C. Gen. Stat. § 7A-452(e)). However, "due process does not require a verbatim transcript of the entire proceedings[.]" *Id.* (quotation marks, citation, and brackets omitted). Generally, a defendant is entitled to "a transcript of the testimony and evidence presented by the defendant and also the court's charge to the jury, as well as the testimony and evidence presented by the prosecution." *Id.* (quoting *Hardy v. United States*, 375 U.S. 277, 282 (1964)).

Here, Defendant's case was tried from 1 to 5 March 2021 and the transcript consists of four volumes. Volume I transcribes the COVID-19 safety protocols and initial jury impanelment proceedings that took place on 1 March 2021. At the end of volume I, the transcript states, "The jury impanelment proceedings recessed at 4:21 p.m. on Monday, March 1, 2021, continued through Tuesday, March 2, 2021, and resumed 9:00 a.m. Wednesday, March 3, 2021." Volume II starts by noting, "The following proceedings with the defendant present and outside the presence of the jurors at 9:02 a.m." The transcript indicates that the trial court then stated, "The

defendant is present with counsel. The State is here represented by counsel. The jury has been selected, not impaneled."

Although the proceedings on 2 March 2021 are not transcribed, it is evident from volumes I and II of the transcript that the trial court conducted jury selection on that day. As the jury was not impaneled and no evidence was presented on 2 March, Defendant was not entitled to a verbatim transcript of those proceedings. *See Hobbs*, 190 N.C. App. at 185, 660 S.E.2d at 170. Accordingly, that there is no verbatim transcript of the jury selection on 2 March 2021 does not deprive Defendant of meaningful appellate review.

Even assuming arguendo that the missing portion of transcript could possibly contain information necessary for a meaningful appeal, Defendant has failed to demonstrate he is prejudiced by its absence.

"[T]he unavailability of a verbatim transcript does not *automatically* constitute reversible error in every case." *In re Shackleford*, 248 N.C. App. 357, 361, 789 S.E.2d 15, 18 (2016). "To prevail on such grounds, a party must demonstrate that the missing recorded evidence resulted in prejudice." *State v. Quick*, 179 N.C. App. 647, 651, 634 S.E.2d 915, 918 (2006) (citation omitted). "General allegations of prejudice are insufficient to show reversible error." *Id.* (citations omitted).

We conduct a three-step inquiry to determine whether the right to a meaningful appeal has been lost due to the unavailability of a verbatim transcript. *State v. Yates*, 262 N.C. App. 139, 142, 821 S.E.2d 650, 653 (2018).

> First, we must determine whether defendant has "made sufficient efforts to reconstruct the [proceedings] in the absence of a transcript." Second, we must determine whether those "reconstruction efforts produced an adequate alternative to a verbatim transcript—that is, one that would fulfill the same functions as a transcript . . . ." Third, "we must determine whether the lack of an adequate alternative to a verbatim transcript of the [proceedings] served to deny [defendant] meaningful appellate review such that a new [trial] is required."

*Id.* (quoting *Shackleford*, 248 N.C. App. at 361-64, 789 S.E.2d at 18-20).

Here, Defendant's appellate counsel made sufficient efforts to reconstruct the record from 2 March 2021 by contacting the trial judge, Defendant's trial attorney, the district attorney who prosecuted the case, the court reporting manager and court reporter who transcribed the proceedings on 1 March 2021 and 3 March 2021, and the deputy clerk of superior court.

Based on his efforts, Defendant determined that on 1 March 2021, the trial court reviewed the COVID-19 safety protocols and began the process of jury impanelment. At the end of the day, Defendant offered several objections to the COVID-19 protocols, and the trial court suggested that Defendant make a list of his objections to consider after impanelment.

Regarding the 2 March 2021 proceedings, Defendant's trial attorney stated:

> In an attempt to reconstruct March 2 and upon review of the materials, I do not recall anything particularly unusual or remarkable about the jury selection. There were no outbursts, no overt comments about race, religion, sexuality or politics by any juror or the State, or any juror acting in a way that I felt was otherwise concerning or

objectionable . . . .

> The materials indicate that the judge denied approximately five (5) of my motions to strike jurors for cause, (3 on March 1, 2 on March 2). Three of the show cause motions were because the respective jurors were either the direct victim of a sexual offense or knew someone close to them who was. One motion was due to the juror's prior professional relationship with Onslow County Sheriff deputies. The fifth was a juror who worked for a property management company I had been adverse to in prior, unrelated civil litigation. As a result of the denials, we elected to use peremptory challenges on all five jurors. The notes from March 2 indicate we used the 6th peremptory challenge that day.

Volume II of the transcript, which covers the proceedings on 3 March 2021, begins with the trial court noting that the jury had been selected but not yet impaneled. The transcript continues:

> THE COURT: So I believe we left this time open to hear from [Defendant] with regards to some motions that he has raised earlier, and I gave him permission to expand on those motions this morning outside the presence of the jury before the case actually -- the evidence is actually received.

Defendant then detailed specific objections to the COVID-19 protocols, including the physical layout of the courtroom, the size of the jury pool, the possible bias of jurors "for having to be here during COVID," and the length of time the proceedings would take with the newly-implemented protocols. After Defendant's objections were addressed, the trial court impaneled the jury. Defendant's efforts produced an adequate alternative to a verbatim transcript in that Defendant can "identify all potential meritorious issues, particularly as they relate to the procedures and manner

in which his trial was conducted." *Yates*, 262 N.C. App. at 142, 821 S.E.2d at 653.

Accordingly, because Defendant made sufficient reconstruction efforts that produced an adequate alternative to a verbatim transcript, he was not deprived of meaningful appellate review. *Shackleford*, 248 N.C. App. at 362, 789 S.E.2d at 19. Defendant's argument that he is entitled to a new trial is thus without merit.

**B. Incest**

Defendant next contends that the trial court erred by denying his motion to dismiss the incest charge. Defendant specifically contends that the term "niece" in N.C. Gen. Stat. § 14-178 does not include a niece-in-law for the purposes of incest as criminalized by that statute. We agree.

"This Court reviews a trial court's denial of a motion to dismiss *de novo*[.]" *State v. Moore*, 240 N.C. App. 465, 470, 770 S.E.2d 131, 136 (2015) (citation omitted). Moreover, "[i]ssues of statutory construction are questions of law which we review *de novo* on appeal[.]" *State v. Hayes*, 248 N.C. App. 414, 415, 788 S.E.2d 651, 652 (2016). Under de novo review, this Court "considers the matter anew and freely substitutes its own judgment for that of the lower tribunal." *State v. Williams*, 362 N.C. 628, 632-33, 669 S.E.2d 290, 294 (2008) (quotation marks and citation omitted).

Upon a defendant's motion to dismiss, the trial court must determine "whether there is substantial evidence of each essential element of the offense charged and of the defendant being the perpetrator of the offense. Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion."

*State v. Worley*, 198 N.C. App 329, 333, 679 S.E.2d 857, 861 (2009) (quotation marks and citations omitted). "[T]he trial court must consider the record evidence in the light most favorable to the State . . . ." *Id.* (citation omitted).

"The primary endeavor of courts in construing a statute is to give effect to legislative intent." *State v. Beck*, 359 N.C. 611, 614, 614 S.E.2d 274, 276-77 (2005) (citations omitted). "Generally, the intent of the General Assembly may be found first from the plain language of the statute, then from the legislative history, the spirit of the act[,] and what the act seeks to accomplish." *State v. Huckelba*, 240 N.C. App. 544, 559, 771 S.E.2d 809, 821 (2015) (quotation marks, brackets, and citation omitted), *rev'd per curiam on other grounds*, 368 N.C. 569, 780 S.E.2d 750 (2015). "If the statutory language is clear and unambiguous, the court eschews statutory construction in favor of giving the words their plain and definite meaning." *Beck*, 359 N.C. at 614, 614 S.E.2d at 277 (citation omitted). "When, however, a statute is ambiguous, judicial construction must be used to ascertain the legislative will." *Id.* (quotation marks and citation omitted). Moreover, "criminal statutes are to be strictly construed against the State." *State v. Raines*, 319 N.C. 258, 263, 354 S.E.2d 486, 489 (1987) (quotation marks and citation omitted).

The offense of incest is governed by section 14-178(a) of our General Statutes, which provides:

> A person commits the offense of incest if the person engages in carnal intercourse with the person's (i) grandparent or grandchild, (ii) parent or child or

        stepchild or legally adopted child, (iii) brother or sister of the half or whole blood, or (iv) uncle, aunt, nephew, or niece.

N.C. Gen. Stat. § 14-178(a) (2018).

In its primary sense, "niece" is defined as "[t]he daughter of a person's brother or sister[,]" *Niece, Black's Law Dictionary* (11th ed. 2019), and is understood to be a relationship of consanguinity. *See Consanguinity*, *Black's Law Dictionary* (11th ed. 2019) (defining "consanguinity" as "[t]he relationship of persons of the same blood or origin"). In a secondary sense, "niece" is only "*sometimes* understood to include the daughter of a person's brother-in-law or sister-in-law[,]" *Niece, Black's Law Dictionary* (11th ed. 2019) (emphasis added), and is only sometimes understood to be a relationship of affinity. *See Affinity*, *Black's Law Dictionary* (11th ed. 2019) (defining "affinity" as "[a]ny familial relation resulting from a marriage"). The plain language of the term "niece" in its primary sense indicates the legislature's intent to criminalize carnal intercourse with "[t]he daughter of a person's brother or sister[,]" a relationship of consanguinity. However, the scope of the term "niece" could be subject to debate, depending on which dictionary definition is used, and thus could be considered ambiguous. *See State v. Sherrod*, 191 N.C. App. 776, 778, 663 S.E.2d 470, 472 (2008) (The language of a statute is ambiguous when it is "fairly susceptible of two or more meanings."); *State Auto. Mut. Ins. Co. v. Hoyle*, 106 N.C. App. 199, 201, 415 S.E.2d 764, 765 (1992) ("A word is ambiguous when it is reasonably capable of more than one meaning.").

Even so, the text of the relevant statutory provision further supports the legislature's intent that a "niece" must be a consanguineous relationship to constitute the crime of incest. *See State v. Conley*, 374 N.C. 209, 215, 839 S.E.2d 805, 809 (2020) ("[A] statute must be considered as a whole[.]" (quotation marks omitted)). The relationships detailed in section 14-178 are all those of consanguinity, except the relationships of child by marriage or legal adoption. In the application of criminal law, it would be an unwarranted extension and presumption to assume that, by specifying the relationship of child by marriage or legal adoption, the legislature intended to include other nonconsanguineous relationships. *See State v. McCants*, 275 N.C. App. 801, 824, 854 S.E.2d 415, 432 (2020) ("Under the doctrine of *expressio unius est exclusio alterius*, when a statute lists the situations to which it applies, it implies the exclusion of situations not contained in the list.").

Furthermore, the legislative history, the spirit of the incest statute, and what the statute seeks to accomplish all confirm the legislative intent that a "niece" must be a consanguineous relationship for the purpose of criminalizing incest.

In January 1878, the North Carolina Supreme Court issued *State v. Keesler*, 78 N.C. 469 (1878), dismissing an indictment against the defendant for incest for his having had improper intercourse with his daughter. The Court explained, "This offence was not indictable at common law, and as we have no statute in this State declaring it to be a criminal offence, this indictment cannot be maintained." *Id.* at 469. Noting that "[i]n most of the States of the Union incest is made an indictable

offence by statute[,]" the Court opined that "[p]erhaps its rare occurrence in this State has caused the revolting crime to pass unnoticed by the Legislature." *Id.* at 469-70.

Immediately following *Keesler*, the General Assembly criminalized incest in 1879 by sections 1060 and 1061 of the North Carolina Code. Section 1060 provided:

> In all cases of carnal intercourse between grand parent and grand child, parent and child, and brother and sister, of the half or whole blood, the parties shall be guilty of felony, and punished for every such offence by imprisonment in the county jail or penitentiary for a term not exceeding five years, in the discretion of the court.

1 N.C. Code of 1883, § 1060. Section 1061 provided:

> In all cases of carnal intercourse between uncle and niece, and nephew and aunt, the parties shall be guilty of a misdemeanor, and punished by fine or imprisonment, in the discretion of the court.

*Id.* § 1061.

In *State v. Laurence*, 95 N.C. 659 (1886), our Supreme Court held that section 1060 applies to both legitimate and illegitimate children. The Court stated that "[i]t is obvious that the legitimacy of birth in one of the offending parties is not, and ought not to be, an essential ingredient in the crime" because the statute prohibits intercourse between those who are "related in those degrees by consanguinity[.]" *Id.* at 660.

In 1905, the General Assembly recodified sections 1060 and 1061 as sections

3351 and 3352, respectively. *See* 1 N.C. Revisal of 1905, §§ 3351, 3352.[3] Section 3351 continued to criminalize as felony incest "carnal intercourse between grandparent and grandchild, parent and child, and brother and sister, of the half or whole blood," punishable by imprisonment for a term not exceeding five years, but changed the location of imprisonment from the "county jail or penitentiary" to the "state's prison[.]" *Id.* § 3351. Section 3352 continued to criminalize as misdemeanor incest "carnal intercourse between uncle and niece, and nephew and aunt," punishable by fine or imprisonment. *Id.* § 3352.

In *State v. Harris*, 149 N.C. 513, 62 S.E. 1090 (1908), our Supreme Court upheld the defendant's conviction for incest where the sole question before the Court was whether the daughter of the defendant's half-sister came within the language of section 3352. The Court explained:

> For obvious reasons, nothing is said [in section 3352] of the half or whole blood. The relation of uncle and niece must of necessity be of the half blood, as in all other relations of consanguinity, other than those defined in [section 3351]. As here, the daughter of defendant's sister is of course related to him only by the half blood. The fact that the mother of the girl is only half sister of defendant cannot affect the case . . . .

---

[3] Section 3351 provided that "In all cases of carnal intercourse between grandparent and grandchild, parent and child, and brother and sister, of the half or whole blood, the parties shall be guilty of a felony, and punished for every such offense by imprisonment in the state's prison for a term not exceeding five years, in the discretion of the court." 1 N.C. Revisal of 1905, § 3351. Section 3352 provided that: "In all cases of carnal intercourse between uncle and niece, and nephew and aunt, the parties shall be guilty of a misdemeanor, and punished by fine or imprisonment, in the discretion of the court." *Id.* § 3352.

*Id.* at 514, 62 S.E. at 1090-91.  Accordingly, the Court concluded the "defendant and his niece, the daughter of the half sister, are clearly within the statute." *Id.* at 514, 62 S.E. at 1091.

In 1919, the General Assembly recodified sections 3351 and 3352 as sections 4337 and 4338, respectively, of the Consolidated Statutes.[4]  Section 4337 continued to criminalize as felony incest "carnal intercourse between grandparent and grandchild, parent and child, and brother and sister, of the half or whole blood," punishable by a term of imprisonment in the state's prison, but increased the allowable term of imprisonment from "not exceeding five years" to "not exceeding fifteen years[.]"  1 N.C. Consol. Stat. of 1919, § 4337.  Section 4338 continued to criminalize as misdemeanor incest "carnal intercourse between uncle and niece, and nephew and aunt," punishable by fine or imprisonment.  *Id.* § 4338.  In 1943, sections 4337 and 4338 were recodified as sections 14-178 and 14-179, respectively, of the North Carolina General Statutes.  The recodified sections were identical to their predecessors.

In *State v. Rogers*, 260 N.C. 406, 133 S.E.2d 1 (1963), our Supreme Court reversed the defendant's conviction for incest where the defendant had sexual

---

[4] Section 4337 provided that: "In all cases of carnal intercourse between grandparent and grandchild, parent and child, and brother and sister of the half or whole blood, the parties shall be guilty of a felony, and shall be punished for every such offense by imprisonment in the state's prison for a term not exceeding fifteen years, in the discretion of the court."  1 N.C. Consol. Stat. of 1919, § 4337.  Section 4338 provided that "In all cases of carnal intercourse between uncle and niece, and nephew and aunt, the parties shall be guilty of a misdemeanor, and shall be punished by fine or imprisonment, in the discretion of the court."  *Id.* § 4338.

relations with his adopted daughter.  At that time, section 14-178 read:

> In all cases of carnal intercourse between grandparent and grandchild, parent and child, and brother and sister of the half or whole blood, the parties shall be guilty of a felony, and shall be punished for every such offense by imprisonment in the State's prison for a term not exceeding fifteen years, in the discretion of the court.

*Id.* at 407-08, 133 S.E.2d at 2 (quoting N.C. Gen. Stat. § 14-178).  The Court explained, "The crime of incest is purely statutory, and our statute is based on consanguinity and, therefore, excludes affinity.  Our statute . . . would not include the relationship between a stepfather and his stepdaughter, since their relationship would not be one of consanguinity."  *Id.* at 409, 133 S.E.2d at 3 (citation omitted).  Noting that "[t]he word 'daughter' means, and is generally understood to mean, 'an immediate female descendant,' and not an adopted daughter, a stepdaughter, or a daughter-in-law[,]" the Court concluded that while "[t]he defendant's conduct . . . in having sexual relations with his adopted daughter[] is indeed detestable, [i]t rests, however, within the power of the Legislature to make such conduct incestuous."  *Id.* (quotation marks and citation omitted).

Immediately following *Rogers*, the General Assembly amended section 14-178 in 1965 to include the affinity relationship of "stepchild" and the legal relationship of "legally adopted child," as follows:

> The parties shall be guilty of a felony in all cases of carnal intercourse between (i) grandparent and grandchild, (ii) parent and child or stepchild or legally adopted child, or (iii) brother and sister of the half or whole blood.

> Punishment for every such offense shall be imprisonment in the State prison for a term of not more than fifteen years, in the discretion of the court.

N.C. Gen. Stat. § 14-178 (1969).[5] Section 14-179 remained unchanged. *See* N.C. Gen. Stat. § 14-179 (1969).

In 2002, the General Assembly enacted "An Act to Close the Legal Loophole that Exists Under the State's Incest Laws by Equalizing Punishments for Crimes Committed Against Children Without Regard to Familial Status[.]" *See* 2002 N.C. Sess. Laws 280 (capitalization altered). The Act consolidated portions of sections 14-178 and 14-179, repealed section 14-179, and enacted a new section 14-178, labeled "Incest," which reads as follows:

> (a) Offense. – A person commits the offense of incest if the person engages in carnal intercourse with the person's (i) grandparent or grandchild, (ii) parent or child or stepchild or legally adopted child, (iii) brother or sister of the half or whole blood, or (iv) uncle, aunt, nephew, or niece.
>
> (b) Punishment and Sentencing. –
>
> > (1) A person is guilty of a Class B1 felony if either of the following occurs:
> >
> > > a. The person commits incest against a child under the age of 13 and the person is at least 12 years old and is at least four years older than the child when the incest occurred.
> > >
> > > b. The person commits incest against a child who is 13, 14, or 15 years old and the person is at least six years older than the child when

---

[5] Section 14-178 was amended by 1965 N.C. Sess. Laws 190, but the amended statute did not appear in the North Carolina General Statutes until the 1969 volume.

the incest occurred.

> (2) A person is guilty of a Class C felony if the person commits incest against a child who is 13, 14, or 15 and the person is more than four but less than six years older than the child when the incest occurred.

> (3) In all other cases of incest, the parties are guilty of a Class F felony.

> (c) No Liability for Children Under 16. — No child under the age of 16 is liable under this section if the other person is at least four years older when the incest occurred.

2002 N.C. Sess. Laws 281.

The relationships specified remained unchanged, but the Act increased the punishment and sentencing for individuals convicted of incest to equalize punishments for crimes committed against children, without regard to whether the perpetrators are related to their victims. *Id.* Notably, the Act increased the punishment for incest based on carnal intercourse with an aunt, uncle, nephew, or niece from a misdemeanor to a felony. *Id.* The Act also created different punishment classes based on certain age requirements. *Id.* Finally, the Act excused any child under the age of 16 from liability for incest if the other person was at least four years older when the incest occurred. *Id.* The version of N.C. Gen. Stat. § 14-178 adopted in 2002 remains in effect today.

By tracing the legislative history and judicial treatment of incest from 1878 to the present, the following is apparent: Our legislature has actively criminalized incest since 1879, presumably in response to our Supreme Court dismissing an incest indictment because North Carolina had no incest statute. *See Keesler*, 78 N.C. at 469.

The first incest statutes criminalized carnal intercourse between an uncle and a niece, and the punishment was later increased from a misdemeanor to a felony. Our courts have repeatedly stated that our incest statutes are based on consanguinity, not affinity, except where the legislature has specified otherwise. *See Laurence*, 95 N.C. at 660 (holding that the incest statute prohibits intercourse between individuals who are "related in those degrees by consanguinity"); *Harris*, 149 N.C. at 514, 62 S.E. at 1091 ("The relation of uncle and niece must of necessity be of the half blood, as in all other relations of consanguinity, other than those defined in [section 3351]."); *Rogers*, 260 N.C. at 409, 133 S.E.2d at 3 ("The crime of incest is purely statutory, and our statute is based on consanguinity and, therefore, excludes affinity. Our statute . . . would not include the relationship between a stepfather and his stepdaughter, since their relationship would not be one of consanguinity."). The legislature acted swiftly in 1965, presumably in response to *Rogers*, to amend the statute to include the affinity relationship of "stepchild" and the legal relationship of "legally adopted child."

The legislature has the authority, and has had the opportunity, to expand the definition of incest to include familial relationships by affinity or other means, as it did in 1965 with stepchildren and legally adopted children. However, even in 2002 when it consolidated sections 14-178 and 14-179 and significantly overhauled the punishment and sentencing for incest, the legislature did not expand the definition of incest to include familial relationships by affinity or other means. Had the

- 19 -

legislative intent been to include what, in this case, would commonly be called a relationship of niece-in-law and uncle-in-law, it would have done so.

Furthermore, judicially expanding the definition of incest to include familial relationships by affinity or other means "could lead to absurd results." *Beck*, 359 N.C. at 615, 614 S.E.2d at 277. Incest is defined as "sexual intercourse between persons so closely related that marriage is illegal[.]" *The Merriam-Webster Dictionary* 251 (2019). *See also Incest, Black's Law Dictionary* (11th ed. 2019) (defining "incest" as "[s]exual relations between family members or close relatives, including children related by adoption"). In North Carolina, "marriages between any two persons nearer of kin than first cousins, or between double first cousins" are void. N.C. Gen. Stat. § 51-3 (2018). In ascertaining whether persons are nearer of kin than first cousins, "the half-blood shall be counted as the whole-blood . . . ." N.C. Gen. Stat. § 51-4 (2018). Expanding the scope of section 14-178 to include a niece-in-law would mean that, while an individual could marry their niece-in-law where certain age restrictions do not prohibit otherwise, that individual would be guilty of incest if the marriage were consummated.

We thus conclude that the term "niece" in N.C. Gen. Stat. § 14-178 does not encompass a niece by affinity for the purposes of incest as criminalized by that statute. Our construction is consistent with a majority of other jurisdictions with similar statutes that have addressed whether sexual intercourse between an uncle and niece, related only by affinity, is incestuous within the meaning of their statutes.

*See State v. Tucker*, 93 N.E. 3, 4 (Ind. 1910) ("[T]o constitute the crime of incest by uncle and niece under the provisions of the act under consideration they must be such kindred by the ties of consanguinity."); *State v. Moore*, 262 A.2d 166, 169 (Conn. 1969) ("Had the legislative intent been to include what, in this case, would commonly be called a relationship of niece-in-law and uncle-in-law, it would have been a simple matter to say so.[6]"); *State v. Anderson*, 484 N.E.2d 640, 641 (Ind. Ct. App. 1985) ("Although the statute[7] does not contain a requirement for consanguinity in the case of incest between an uncle and a niece, this precise question was addressed by our Supreme Court in *State v. Tucker* . . . . Thus, the trial court's judgment dismissing the charges is affirmed."); *Hull v. State*, 686 So. 2d 676, 677 n.2 (Fla. Dist. Ct. App. 1996) ("The relationship of uncle-in-law and niece-in-law is clearly not alone sufficient to . . . implicate the incest statute, section 826.04, Florida Statutes (1995)[.8]"); *State v. Dodd*, 871 S.W.2d 496, 497 (Tenn. Crim. App. 1993) (reversing the conviction of a defendant who had sexual relations with the daughter of his wife's

---

[6] "Every man and woman who marry or carnally know each other, being within any of the degrees of kindred specified in section 46-1, shall be imprisoned in the State Prison not more than ten years." Conn. Gen. Stat. § 53-223 (1969). "No man shall marry his mother, grandmother, daughter, granddaughter, sister, aunt, niece, stepmother or stepdaughter, and no woman shall marry her father, grandfather, son, grandson, brother, uncle, nephew, stepfather or stepson . . . ." Conn. Gen. Stat. § 46-1 (1969).

[7] "A person eighteen (18) years of age or older who engages in sexual intercourse or deviate sexual conduct with another person, when he knows that the other person is his parent, stepparent, child, stepchild, grandparent, grandchild, sibling, aunt, uncle, niece, or nephew, commits incest, a Class D felony." IND. CODE § 35-46-1-3 (1977).

[8] "Whoever knowingly marries or has sexual intercourse with a person to whom he is related by lineal consanguinity, or a brother, sister, uncle, aunt, nephew, or niece, commits incest[.]" Fla. Stat. § 826.04 (1995).

half-sister where the applicable incest statute "include[d] all relationships of consanguinity and only a *limited number* of those by affinity[.]" (emphasis added)).

In this case, because Mary is not Defendant's niece by consanguinity, Mary is not Defendant's niece as contemplated by N.C. Gen. Stat. § 14-178 and the trial court erred by denying Defendant's motion to dismiss the incest charge. We therefore vacate Defendant's incest conviction and remand for resentencing.

## C. **Defendant's Statements at the Sheriff's Office**

Defendant contends that the trial court erred by denying his motion to suppress his inculpatory statements made at the Onslow County Sheriff's Office following his arrest. Defendant specifically contends that the trial court's findings of fact are incomplete and that the evidence does not support the conclusion that his statements were made voluntarily.

"The standard of review for a motion to suppress evidence is whether the trial court's findings of fact are supported by competent evidence and whether the findings support the court's conclusions of law." *State v. Boyd*, 207 N.C. App. 632, 636, 701 S.E.2d 255, 258 (2010) (quotation marks and citation omitted). "Unchallenged findings of fact are deemed supported by competent evidence and are binding on appeal." *State v. Davis*, 237 N.C. App. 22, 27-28, 763 S.E.2d 585, 589 (2014) (citation omitted). "The trial court's conclusions of law, however, are fully reviewable on appeal." *State v. Hughes*, 353 N.C. 200, 208, 539 S.E.2d 625, 631 (2000).

The trial court made the following relevant findings of fact in its written order

denying Defendant's motion to suppress:

> 6. Accompanied by local law enforcement, the detectives arrested the defendant once he arrived back at Raleigh-Durham Airport on August 7, 2018 at approximately 11:00 a.m. after a flight from Colombia.
>
> 7. The defendant was transported to Onslow County by the detectives in an Onslow County Sheriff's Department motor vehicle. The defendant, at the time of the arrest, was 42 and was an active duty marine stationed in the provost marshal office aboard Camp Lejeune, N.C.
>
> 8. The defendant was handcuffed in front of his body and sat in the front passenger seat while Detective Pete Johnston drove, and Detective Charles Parrish was seated in the rear seat behind the defendant. They arrived at the Onslow County Sheriff's Office at shortly after 1:30 p.m. An audio recording of the conversation in the car during the trip was captured through a Go-Pro device in the car, and portions were played for the jury.
>
> 9. Shortly after they left RDU on the trip back to Onslow County, the defendant initiated questioning about his case. The detectives stopped him, and Johnston told him that "as long as you are in custody, you know as well as we do, that we cannot really talk." He was told that if he wanted to talk, they would have to go over the rights form. The defendant asked what they thought he ought to do, and Johnston told him it was "what he thought." He advised the officers that he wanted to ask them "what is coming" and "what he is facing." In response the officers told him that whether he talked about the case was "totally up to him." He was told that after they went over the form, he could then make a decision as to what he wanted to do. After his rights were read to him, the defendant appeared to decide that he would not sign the waiver and talk then but wait until he got back. Discussion about the case ceased at that point.
>
> 10. They basically advised him that it was his choice as to whether he wanted to talk about the case. In the car Detective Parrish at 11:28 a.m. read him his Miranda

rights . . . . The language of the waiver was also read to the defendant by Detective Parrish, but he chose not to execute the waiver at that time.

11. In the car after each right was read to him, the defendant orally answered "Yes, Sir." After being handed the printed Interrogation-Advisement of Rights form on a clipboard, the defendant initialed each right in the space provided after each right. He advised that from his work in the Provost Marshal's office, he jokingly stated that he had read those rights "a few times himself" in his law enforcement work. He chose not to sign under the waiver of rights paragraph at that time, and returned the clipboard containing the rights form back to Detective Parrish.

. . . .

14. Once the defendant got seated next to the table, he was provided the same rights waiver form, which he had previously been read from in the car and on which he had initialed next to each right during the trip from the airport.

15. Once he joined the defendant and Deputy Parrish already seated in the room, Detective Johnston told him that now they had to be a "little more candid than they were in the car." The defendant was told not to say anything but just to listen, and they will go over "some stuff." The defendant was told "Nothing you say here is going to change the things that happened. You are fully charged with the offense."

16. This was said to the defendant by Detective Johnston because the warrant for arrest for statutory rape had already been issued, and because of that, nothing that was going to be discussed during the interrogation was going to change the status of the case.

. . . .

18. The defendant was advised that they work in the Special Victims Unit, and they know there are always "two sides to every story, and they are never going to arrest anyone without giving them an opportunity to tell them what's going on." In order to give the defendant that

opportunity, they had to "finish signing and going over that [rights] form" which the defendant had in front of him. "That is up to you. Before we address that and ask you what you want to do with that, keep in mind, again, that nothing you say in here is going to hurt you or change the situation as it stands. It will give us some insight. Right now we have a little girl that "we kind to (sic) have more questions than we have answers for. Now we are hoping that you can shed some light on what is going on with her." Parrish advised him that part of their job was the consideration of the welfare of the victims.

19. . . . After which, the defendant signed the waiver form at 2:02 p.m . . . .

. . . .

24. After the defendant continued to deny any misconduct, Detective Johnston eventually told the defendant that based on other sources that the defendant did not know about, "stuff" was not adding up and he could not explain it. He intimated that defendant was not telling the truth.

25. About thirty minutes into the interrogation the defendant stated that "I fucked up. I screwed up." He stated that he and the victim got close and kissed. On the day he left for Colombia while the victim's parents were at work, he had gotten the victim to put coconut butter on his back after he had been sunbathing. They talked about the victim's boyfriend in Spain and went into the garage and had intercourse. He told law enforcement that he did not force her.

26. When it appeared to Detective Johnston that the defendant was close to making an inculpatory statement, he reached over and touched the defendant on his knee with an open palm. Johnston explained that this was a technique to show empathy and humanity to the defendant . . . .

27. The defendant never requested counsel, never asked that the questioning stop and never invoked his right to remain silent.

### 1. *Findings of Fact*

Defendant does not challenge any findings of fact; they are thus binding on appeal. *See State v. Hoque*, 269 N.C. App. 347, 361, 837 S.E.2d 464, 475 (2020). Defendant instead argues that the trial court's findings of fact are incomplete because the trial court failed to "make [a] finding of fact as to how many times and when Johnston touched [Defendant]." However, the findings of fact need not summarize *all* the evidence presented at voir dire. *State v. Dunlap*, 298 N.C. 725, 730, 259 S.E.2d 893, 896 (1979). Indeed, if there is no conflicting testimony about the facts alleged, it is permissible for the trial court to admit evidence a defendant seeks to suppress without making specific findings of fact at all, although it is better practice to make them. *Id.* In light of this rule, it is enough that the findings are supported by substantial and uncontradicted evidence, as they are here, and Defendant's argument is overruled.

### 2. *Voluntariness*

"The determination of whether a defendant's statements are voluntary and admissible is a question of law and is fully reviewable on appeal." *State v. Maniego,* 163 N.C. App. 676, 682, 594 S.E.2d 242, 245-46 (2004) (quotation marks and citation omitted). We look at the totality of the circumstances to determine whether the confession was voluntary. *State v. Cortes-Serrano*, 195 N.C. App. 644, 655, 673 S.E.2d 756, 763 (2009).

The requisite factors in the totality of the circumstances

> inquiry include: 1) whether the defendant was in custody at the time of the interrogation; 2) whether the defendant's *Miranda* rights were honored; 3) whether the interrogating officer made misrepresentations or deceived the defendant; 4) the interrogation's length; 5) whether the officer made promises to the defendant to induce the confession; 6) whether the defendant was held incommunicado; 7) the presence of physical threats or violence; 8) the defendant's familiarity with the criminal justice system; and 9) the mental condition of the defendant.

*State v. Martin*, 228 N.C. App. 687, 690, 746 S.E.2d 307, 310 (2013) (citation omitted).

"The presence or absence of one or more of these factors is not determinative." *State v. Greene*, 332 N.C. 565, 579, 422 S.E.2d 730, 738 (1992) (citation omitted).

Here, Defendant was advised of his *Miranda* rights, and, after each right was read to him, he orally answered "Yes, Sir." After Defendant was handed the Interrogation-Advisement of Rights form, he initialed in the space provided after each right. At the time of his arrest, Defendant was an active duty marine stationed in the provost marshal office in Camp Lejeune and "he jokingly stated that he had read those rights 'a few times himself' in his law enforcement work." Upon arrival at the Onslow County Sheriff's Office, Defendant was placed into an interrogation room where he waited for approximately fifteen minutes for the officers to return. Thereafter, he was permitted to use the restroom before returning to the interrogation room. Defendant was again advised of his *Miranda* rights, and he signed the rights waiver form. The interrogation proceeded for approximately thirty minutes before Defendant made inculpatory statements. Defendant did not appear

to be under the influence of any alcohol or drugs, did not display any ill effects from his trip from Colombia, and conversed in fluent English.

The findings of fact support the trial court's conclusion that "[f]rom the totality of the circumstances, the defendant was aware of his constitutional rights at the time of his interrogation[,]" and that "the defendant was fully and completely advised of his *Miranda* warnings, and his waiver of his *Miranda* rights was executed freely, knowingly, voluntarily and intelligently." The findings of fact also support the trial court's conclusion of law that "the defendant's inculpatory statements were made voluntarily and understandingly." Thus, Defendant's argument lacks merit.

## D. Clerical Error

Defendant contends, and the State essentially concedes, that the case must be remanded to the trial court to correct a clerical error in the trial court's judgment. We agree.

"When, on appeal, a clerical error is discovered in the trial court's judgment or order, it is appropriate to remand the case to the trial court for correction because of the importance that the record speak the truth." *State v. Smith*, 188 N.C. App. 842, 845, 656 S.E.2d 695, 696-97 (2008) (quotation marks and citation omitted).

Here, the jury convicted Defendant of sexual activity by a substitute parent. Prior to sentencing, however, the trial court orally dismissed Defendant's conviction of sexual activity by substitute parent:

> [DEFENDANT]: I would make further motions to dismiss

all charges. The arguments previously set forth for the record, if the Court could just take judicial notice of the content of those. They were voluminous. That would be the bases for any further motions.

THE COURT: Okay.

[DEFENDANT]: I'm happy to expound upon anything you want, Judge, but --

THE COURT: Okay.

[DEFENDANT]: -- they've been argued several times.

THE COURT: The Court is going to allow the motion to dismiss as to the sexual activity by substitute parent.

[DEFENDANT]: Thank you, Judge.

Thereafter, the trial court consolidated the remaining convictions for sentencing. However, the judgment and subsequent modified judgment indicate that Defendant was convicted of sexual activity by a substitute parent. Accordingly, we remand for correction of the clerical error.

## III. Conclusion

Defendant's incest conviction is vacated and remanded for resentencing and for correction of a clerical error on the written judgment.

NO ERROR IN PART; VACATED IN PART AND REMANDED FOR RESENTENCING AND FOR CORRECTION OF JUDGMENT.

Judges DILLON and WOOD concur.